278 N.J. Super. 351 (1995)
651 A.2d 103
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
DWAIN FORD AND MICHAEL PRATT, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 29, 1994.
Decided January 3, 1995.
*352 Before Judges LANDAU, CONLEY and NEWMAN.
A. Victoria Pinette, Assistant Prosecutor, argued the cause for appellant (Edward F. Borden, Jr., Camden County Prosecutor, attorney; Ms. Pinette, of counsel and on the letter-brief).
Terence A. Lytel, Assistant Deputy Public Defender, argued the cause for respondent Michael Pratt (Susan L. Reisner, Public Defender, attorney; Mr. Lytel, of counsel and on the letter-brief).
Edward J. Crisonino argued the cause for respondent Dwain Ford (Jonas & Crisonino, attorneys; Mr. Crisonino, on the letter brief).
The opinion of the court was delivered by LANDAU, J.A.D.
On leave granted, the State has appealed from the grant of a motion by defendants Dwain Ford and Michael Pratt to suppress evidence seized by police, including $280 in currency, and a bag containing thirty-seven smaller bags of cocaine. Ford and Pratt ("defendants") are charged with possessing cocaine with intent to distribute, and with distribution of cocaine.
The facts are essentially undisputed. The motion judge accepted as credible the testimony of the State's witnesses, Detective Joseph Galiazzi and Officer Dallas Carter. Detective Galiazzi, together with other members of the Camden Police Department, *353 was engaged in an undercover surveillance of narcotics dealing in the vicinity of 32nd Street and Pleasant Street, known as a drug trafficking area. From his place of observation in a van parked on the street, Galiazzi observed and heard defendant Pratt ask a male, who had just exited a green Chevy pick-up truck with New Jersey tags AL8783, "how much he needed." The male responded that he needed "four", and Pratt "yelled" to defendant Ford, who was standing in front of a house at 613 North 32nd Street, "He wants four." Galiazzi saw Ford walk into the yard and towards the side of the house. No testimony was presented as to whether or not the house was occupied or vacant and, if occupied, who owned it.
Patrolman Carter, who was part of the "take down unit"[1], was contacted by Galiazzi over the radio and asked to position himself so as to observe where the then unidentified individual (Ford) was going to secure the narcotics which were being sold in front of the house.
Carter testified that:
There was a hole. The side of the house bowed out. He came down the walkway on the side of the house. He kneeled down. There is a hole in the bottom portion, and there was like a clear plastic bag. He reached his hand up that, got the bag, took a small item out and placed the bag back up there.
Carter, who identified Ford in court as the person involved, contacted Galiazzi by radio and told him that he had "observed where he retrieved the item from." Galiazzi observed Ford hand several objects to Pratt, and also observed Pratt hand the objects to the pick-up truck driver, who reentered the truck and drove off. He also observed the driver hand money to Pratt, which was in turn handed to Ford. Based on information from an assist unit, word was received by radio that the truck was stopped, the driver detained, and drugs recovered. The defendants were then arrested. Another detective was guided by Carter to the place where Ford had been observed reaching up by the side of the house, and *354 the detective recovered the bag which contained thirty-seven clear plastic bags of suspected cocaine.
The motion judge rejected the State's arguments that seizure of the bag was dictated by exigency, and that defendants had no "reasonable legitimate expectation of privacy in these stashed narcotics." Although finding probable cause for a search, he concluded that this had been a warrantless entry inside a home, and that the bag was not in plain view because it had been concealed and was not "readily accessible to the public." Thus, the evidence of the bag and its contents was ordered suppressed. As the State presented no testimony respecting the $280 in currency, that evidence was also suppressed.

The Legal Issues
We deem it appropriate to consider this appeal on the premise that defendants' standing under Alston is unquestioned.[2] Having done so, we nonetheless conclude that the order of suppression must be reversed as to the stash of cocaine.
The linchpin in our reasoning is not the existence of exigent circumstances, nor whether this was a search lawfully incident to arrest. We are satisfied that there were sufficient police resources *355 upon the scene after arrest of the two co-defendants to safely secure the location of the contraband pending procurement of a warrant. Our attention on review has more properly been focused upon the State's assertion that, "One [sic] cannot commit a crime on a public street, in clear view of anyone passing by, and then claim their privacy rights have been violated because officers watched where they hid the instrumentalities of their crimes." This proposition parallels a maxim cited in California v. Greenwood, 486 U.S. 35, 41, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30, 37 (1988), and specifically approved in State v. Hempele, 120 N.J. 182, 209, 576 A.2d 793 (1990):
[T]he police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public.
Thus, defendants' privacy rights were altered when Officer Carter, lawfully in a position where any member of the public could have been, observed evidence of a possible crime (possession and concealment of narcotics) being committed before his very eyes, and observed the contraband and the precise place where it was concealed, and its ready accessibility from an exterior portion of the house.
We recognize that proper application of the "plain view" doctrine requires both that the police officer be lawfully in the viewing area and that there be probable cause for search or seizure. See Arizona v. Hicks, 480 U.S. 321, 326-27, 107 S.Ct. 1149, 1153-54, 94 L.Ed.2d 347, 354-55 (1987); State v. Lewis, 116 N.J. 477, 485, 561 A.2d 1153 (1989); State v. Bruzzese, 94 N.J. 210, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). In Arizona v. Hicks, supra, the United States Supreme Court recognized the difference between securing a warrant for an exploratory search and seizing contraband without a warrant after its lawful plain viewing, upon legitimate probable cause. Earlier, in Illinois v. Andreas, 463 U.S. 765, 771-72, 103 S.Ct. 3319, 3324, 3324-25, 77 L.Ed.2d 1003, 1010 (1983), the Court recognized that once police officers who are lawfully in position observe the probable criminal nature of an item, the owner's privacy interest in that item is lost, even if the owner *356 retains the incidents of title and possession. See also State v. Burgos, 185 N.J. Super. 424, 427, 449 A.2d 536 (App.Div. 1982). Moreover, where police officers are cooperating in the same investigation, the knowledge of one is presumed shared by all. See Whiteley v. Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306, 313 (1971). Thus, Carter properly directed the detective who retrieved the contraband bag to its location.
As made clear in Segura v. United States, 468 U.S. 796, 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599, 612 (1984):
[T]he home is sacred in Fourth Amendment terms not primarily because of the occupants' possessory interest in the premises, but because of their privacy interests in the activities that take place within. "[T]he Fourth Amendment protects people, not places."
[Id. (quoting Katz v. U.S., 389 U.S. 347, 351, 88 S.Ct. 507, [511] 19 L.Ed.2d 576 (1967)).]
However, "a seizure affects only possessory interests, not privacy interests." Ibid.
In the present case, we are not dealing with an exploratory search for evidence. As in State v. Henry, 133 N.J. 104, 627 A.2d 125 cert. denied, ___ U.S. ___, 114 S.Ct. 486, 126 L.Ed.2d 436 (1993), an officer here viewed defendant trying to hide a plastic bag containing the later seized contraband. Although the Henry seizure was upheld as incident to a lawful arrest, we see no reason in principle why, once the officer's lawful right to be present was established, picking up the mattress to retrieve evidence which the officer observed being concealed there would have been deemed an unconstitutional search. The seizure of that evidence would have been subject to no further reasonable expectation of privacy.
Here, seizure of the contraband from its known hiding place occurred only after defendants lost their reasonable privacy interests therein. The police had observed and heard evidence, which the motion judge said he could recognize as a probable narcotics transaction even without expert testimony. Moreover, defendant Ford was not only observed while taking probable cocaine from the bag before replacing it, but the purchaser was known to have been apprehended by another police team with four packets of *357 cocaine, as confirmed by police radio. Thus, ample probable cause existed to believe that contraband was contained in the bag which had been replaced in its hiding spot. Once lawfully exposed to view of the law enforcement officers, the clear plastic bag and its clearly bagged contents remained subject to the plain view rationale. See Illinois v. Andreas, supra.
As we recognized in State v. Anderson, 198 N.J. Super. 340, 348, 486 A.2d 1311 (App.Div.), certif. denied, 101 N.J. 283, 501 A.2d 946 (1985), the resolution of Fourth Amendment issues "peculiarly depends upon the facts involved." Such constitutional issues typically involve "no more than a seasoned `value judgment upon a factual complex rather than an evident application of a precise rule of law'." Ibid. (quoting State v. Funicello, 60 N.J. 60, 72, 286 A.2d 55 (1972) (Weintraub, C.J., concurring), certif. denied, 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972). In determining the appropriate extent of constitutional interest in privacy rights, it has also been recognized as appropriate to balance the nature and extent of intervention against the governmental interest in securing evidence of criminality. See State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986); Anderson, supra, 198 N.J. Super. at 349, 486 A.2d 1311. Here, as we noted above, defendants privacy rights in the contraband had already been forfeited. The seizure of the contraband required no "entry" into the house. Its concealment from public eye was irrelevant, given the known and accessible location of the "stash". Anyone who knew where it was could have readily taken it without entering the house. Defendants' dubious property rights are insufficient to survive the Davis-Anderson balance.
Given the knowledge that a crime had been committed, given both officers' visual observations of the defendants during its commission, and given the observation of the contraband and its place of attempted concealment in an exterior portion of the house accessible by anyone from the outside without entering the house, no compelling constitutional interests require suppression of the seized contraband from its known location. See U.S. v. Romano, *358 388 F. Supp. 101, 104 (E.D.Pa. 1975) (drainpipe not part of the curtilage, because accessible to outsiders); Marullo v. U.S., 328 F.2d 361 (5th Cir.) (no privacy right in top of pillar supporting elevated motel cabin), cert. denied, 379 U.S. 850, 85 S.Ct. 93, 13 L.Ed.2d 53 (1964). Accordingly, the order of suppression is reversed as to the thirty-seven packets of cocaine.
The State provided no proofs respecting the currency which was seized. In consequence, the order is affirmed as to suppression of the currency. The matter is remanded for further proceedings consistent with this opinion.
CONLEY, J.A.D., dissenting.
Here is the crux of the majority decision:
Given the knowledge that a crime has been committed, given both officers' visual observations of the defendants during its commission, and given the observation of the contraband and its place of attempted concealment in an exterior portion of the house accessible by anyone from the outside without entering the house, no compelling constitutional interests require suppression of the seized contraband from its known location.
Because I believe this proposition is both factually misleading and legally incorrect, I dissent. I do so notwithstanding the hesitation one may feel in precluding the police from immediate seizure of contraband where they know its location and know it is contraband.
My difficulty, factually, arises from the reference to "the observation of the contraband and its place of attempted concealment in an exterior portion of the house accessible by anyone from the outside without entering the house." This is not accurate.
Defendants were dealing drugs outside of a residence located at 613 N. 32nd Street. As described by the trial judge "613 N. 32nd Street is a home enclosed by a four (4) foot chain link fence with a gate." Defendants were positioned just outside the gate. The location of the hidden drugs was not visible from the street in front of the house; the officer located there did not see where defendant went because he could not see beyond the fence and front yard from his vantage point. Another officer saw the *359 location of the stash, but he was hidden "in a weed area in the rear of the house, at the house yard itself." He was "in the weeds at the fence line of the house." He did not make his observations from the street behind the house. And, as to the location of the stash itself, defendant was described as walking to the rear side of the house, kneeling down and reaching up "into the house." Apparently there was a hole under or behind a bay window at the location.
Unassailable is the trial judge's finding that:
The CDS bag was well secreted, requiring a discoverer to kneel and then reach up with an arm into a portion of the building.
And contrary to the majority's factual conclusion here, the trial judge expressly found that "[t]he bag was not `readily accessible to animals, children, scavengers, snoops, and other members of the public'. California v. Greenwood, 486 U.S. 35 [108 S.Ct. 1625, 100 L.Ed.2d 30] (1988)."
Thus, the majority's reliance upon Greenwood's maxim that "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public," 486 U.S. 35, 41, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30, 37, is not applicable here. Further, the majority misreads State v. Hempele, 120 N.J. 182, 209, 576 A.2d 793 (1990), to "specifically approve" Greenwood within the context of hidden or secreted evidence located within the zone of privacy protected by the Fourth Amendment. Indeed, Hempele rejects its application to justify the seizure of garbage at one's curbside under the plain view doctrine. 120 N.J. at 209-10, 576 A.2d 793 ("[t]he cases here might be different had the garbage been strewn across the front yard for all to see. Under those conditions these defendants might have forsaken any privacy expectation ... although garbage bags are placed in areas accessible to the public, the contents are not exposed to the public."). And, see also, State v. Saez, 268 N.J. Super. 250, 261, 633 A.2d 551 (App.Div. 1993) ("[d]efendants here did not knowingly expose their activities to public view.... While defendants may have been negligent in shielding their *360 activities from their common neighbor, their expectations as to government intrusion can be viewed differently.").
My difficulty with the majority opinion on a legal basis is twofold. First, it extends the concept of plain view in a warrantless context beyond its legal scope and second, it removes the concept of curtilage and attempts to limit the Fourth Amendment zone of privacy to the interior of the home.
The concept of curtilage is still a part of the Fourth Amendment protections we afford in this State. We still adhere to the concept as expressed in United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326, reh'g denied, 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987). See State v. Ball, 219 N.J. Super. 501, 506, 530 A.2d 833 (App.Div. 1987). Whether an area falls within the curtilage of a house depends upon its proximity to the house, whether it is included within an enclosure surrounding the house, the uses to which the area is put, and the steps taken to protect the area from observation by people passing by. The hidden area here certainly meets these criteria  it is not only close to the house, but described by both the officers, as well as the trial judge, as "up into the building". It is certainly included in the fenced and gated enclosure, not subject to public uses and not observable from the street. Compare United States v. Santana, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300, 305 (1976). It is within the protected zone of a "reasonable expectation of privacy." State v. Hempele, supra, 120 N.J. at 200, 576 A.2d 793.
The legal linchpin of the majority opinion is perhaps what is the most troublesome. It is plain view. To understand exactly how broad and, I think, potentially capable of swallowing the warrant requirement this opinion is, it is important to understand that the majority has held, and correctly so, that the warrantless seizure here was not incident to the arrest of the defendants and was not justified pursuant to exigent circumstances (which includes "hot pursuit", see, Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 1645-46, 18 L.Ed.2d 782, 787 (1967), the avoidance of serious injury to police officers or others, ibid., and *361 the potential destruction of evidence, see United States v. Santana, supra, 427 U.S. at 42-43, 96 S.Ct. at 2409-10, 49 L.Ed.2d at 305-06, and State v. Lewis, 116 N.J. 477, 484, 561 A.2d 1153 (1989)).
Accordingly, there is no justification for the warrantless police access to the hidden area inside the window portion of the house other than the majority's employment of the surveillance observations. There is no question but that these observations would provide a lawful basis for obtaining a warrant. See State v. Fuhs, 265 N.J. Super. 188, 625 A.2d 1151 (App.Div.), certif. denied, 134 N.J. 486, 634 A.2d 532 (1993). There is also no question that the observations would not constitute an unlawful "search." See State v. Saez, supra, 268 N.J. Super. at 260, 633 A.2d 551. And see Texas v. Brown, 460 U.S. 730, 738 fn. 4, 103 S.Ct. 1535, 1541 fn. 4, 75 L.Ed.2d 502, 511 fn. 4 (1983) ("[i]t is important to distinguish `plain view,' as used in Coolidge to justify seizure of an object, from an officer's mere observation of an item left in plain view. Whereas the latter generally invokes no Fourth Amendment search ... the former generally does implicate the Amendment's limitations upon seizures of personal property.").
What this case is all about is allowing law enforcement officers to obtain access to a place they may not normally go to without a warrant on the mere basis of their observations from a distant vantage point. As far as I can tell, the proscription upon the plain view doctrine that the police must independently have a lawful right to access the area from which the contraband is seized, is still viable. See Texas v. Brown, supra, 460 U.S. at 737, 103 S.Ct. at 1541, 76 L.Ed.2d at 511 ("[t]he question whether property in plain view of the police may be seized therefore must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question ... `plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment. `Plain view' is perhaps better understood, therefore, not as an independent `exception' to the warrant clause, but simply as an extension *362 of whatever prior justification for an officer's `access to an object' may be"); Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971) ("[w]here the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate"); State v. Lewis, 116 N.J. 477, 485, 561 A.2d 1153 (1989) ("[p]roper application of the `plain view' doctrine requires ... that the `officer's access to an object [have] some prior justification under the Fourth Amendment.'" quoting Texas v. Brown, supra); State v. Bruzzese, 94 N.J. 210, 237, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984) ("[f]irst, ... [the officer] had a lawful right to be in the defendant's bedroom. The boots were in plain view, were not hidden in a closet....").
The majority turns this proposition askew by asserting that the requirement is that police be lawfully "in the viewing area." Maj. op. at 355, 651 A.2d at 106. Within the meaning of the plain view cases, that viewing area must be synonymous with the area of access. Here the viewing area is not the area of access. More particularly, the stash was not within an area of lawful access. Indeed, as hidden, it was not even within the viewing area of the police.
The potential breadth of the majority's opinion is enormous. If a surveillance team set up on a public street and using high power binoculars sees in an open doorway of a house a person engaging in a drug transaction and then hiding the drugs under a rug in the hallway and who then leaves the house, may the police, based solely upon their observations, enter without a warrant and seize the drugs where no other warrant exception applies? If they make these same observations through an open window, may they enter without a warrant and seize the drugs where no other warrantless exception applies? The logical extension of the majority here is that they may in both instances. I do not think the Fourth Amendment permits either. It may seem unnecessary and wasteful to require law enforcement officers to obtain a warrant when they see and know the location of contraband. But *363 if that location is within a zone of privacy and not seizable as incident to arrest or exigent circumstances and the police are not otherwise lawfully in the area of access, plain view can not be used to avoid what may seem to many to be an inconvenience.
I make one further observation. I would not relegate the factual issue of defendants' authorization to use or occupy the house to a footnote. If they are mere strangers, trespassers or intruders in their use of the house they have no right to assert Fourth Amendment protections. But that would be the only basis upon which the warrantless seizure here could be justified.
Accordingly, I would remand for a limited hearing to determine defendants' relationship to the property. If they had no authorization to use or occupy the premises, I would reverse the suppression. Otherwise I would affirm.
NOTES
[1] A "take down unit" receives instructions from the surveilling detectives as to persons who should be apprehended and their location.
[2] Defendants never asserted that either of them was authorized to occupy or utilize the house. Although it seems unlikely that they were, the trial judge afforded them the rights of a person enjoying such status, reasoning that the State should have proved defendants were not lawful users of the property. This reasoning implies a legitimate question as to whether State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981), and its progeny (e.g., State v. Mollica, 114 N.J. 329, 339, 554 A.2d 1315 (1989); State v. Binns, 222 N.J. Super. 583, 537 A.2d 764 (App.Div.), certif. denied, 111 N.J. 624, 546 A.2d 540 (1988); State v. Curry, 109 N.J. 1, 532 A.2d 721 (1987)) were necessarily intended to afford to burglars or trespassers standing to assert the very property and privacy rights of lawful occupants which they have violated. Thus, upon the remand which we order, we recommend that the trial judge establish by hearing, before trial commences, whether each defendant was a lawful occupant or owner of 613 North 32nd Street, and also whether the house was abandoned, as others in the area appear to have been. The suggestion is made in the interests of a complete record, should defendants be convicted.