**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4391-18T1
                        A-4910-18T1

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

RASHEEM W. McQUEEN and
MYSHIRA T. ALLEN-BREWER,

    Defendants-Respondents.

Argued telephonically February 27, 2020 –
Decided May 19, 2020

Before Judges Alvarez, Suter[1] and DeAlmeida
(Judge DeAlmeida dissenting).

On appeal from an interlocutory order of the Superior
Court of New Jersey, Law Division, Middlesex County,
Indictment No. 19-02-0302.

David Michael Liston, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause
for appellant (Christopher L.C. Kuberiet, Acting

---

[1] Judge Suter did not participate in oral argument. She joins in the opinion with counsel's consent. R. 2:13-2(b).

Middlesex County Prosecutor, attorney; David Michael Liston, of counsel and on the briefs).

Tamar Yael Lerer, Assistant Deputy Public Defender, argued the cause for respondent Myshira T. Allen-Brewer (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, of counsel on the brief).

Gurbir S. Grewal, Attorney General, attorney for amicus curiae Attorney General of New Jersey (Sarah C. Hunt, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

On leave granted, the State appeals a Law Division order suppressing recorded phone conversations between co-defendants Rasheem McQueen and Myshira Allen-Brewer. One tape was made at the Piscataway Police Department, the others at the Middlesex County Adult Correctional Center (Correctional Center). Relying on the suppression order, the judge dismissed the counts of the indictment naming Allen-Brewer. We affirm the judge's May 16, 2019 decision as to the police station recording but reverse as to the calls from the Correctional Center. We reinstate the indictment counts naming Allen-Brewer.

The charges arose on August 27, 2018, when McQueen allegedly sped away from police officers attempting to conduct a traffic stop. He eventually pulled over, but as the officers left their vehicle and approached him, he fled

2

A-4391-18T1

again. The officers called off the pursuit, but one of them had recognized McQueen.

Shortly thereafter, McQueen's grandfather phoned the Piscataway Police Department to report McQueen's car had been stolen; McQueen also got on the line regarding the purported theft. Police arrested McQueen at his home and took him to headquarters for processing.

McQueen's car was promptly located, searched, and found to contain a quantity of oxycodone. Before being transported to the Correctional Center, McQueen called Allen-Brewer on the station house phone. During the call, McQueen lowered his voice to prevent a nearby officer from listening in. McQueen was not advised all telephone calls at the station are recorded. The tape later revealed that McQueen asked Allen-Brewer to dispose of a firearm he had discarded as he drove away from police during the aborted stop.

McQueen and Allen-Brewer spoke again the day after that, this time on the phone at the Correctional Center where McQueen was detained. During that conversation, Allen-Brewer told McQueen she had not found the gun. He responded that he tossed it into a yard with a white picket fence. Acting on a homeowner's complaint, police recovered a loaded handgun, serial numbers removed, in a yard on the street where McQueen had directed Allen-Brewer.

3

On August 29, Allen-Brewer again told McQueen, while on the Correctional Center phone, that she could not find the gun. McQueen said he threw it fairly far into the grass.

At the beginning of inmate Correctional Center calls, an automated message is played stating all calls are recorded and monitored. Additionally, upon arrival every inmate is given a pamphlet explaining Correctional Center telephone calls are recorded and monitored, with the exception of those made to the Internal Affairs Unit and calls to attorneys. The guidelines also advise inmates that abuse of phone privileges "will result in disciplinary action, and can lead to prosecution."

Through service of a grand jury subpoena, the Prosecutor's Office obtained McQueen's taped calls from the police station and the Correctional Center. They were presented, along with other evidence, to the grand jury, which indicted McQueen as follows: second-degree eluding, N.J.S.A. 2C:29-2(b) (count one); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count two); fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3(d) (count three); fourth-degree unlawful possession of ammunition, N.J.S.A. 2C:58-3.3(b) (count four); third-degree hindering his own apprehension (by discarding a handgun), N.J.S.A. 2C:29-3(b)(1) (count five);

third-degree hindering his own apprehension (by hiding a motor vehicle) (count six); third-degree hindering (by changing clothes) (count seven); fourth-degree false reports, N.J.S.A. 2C:28-4(b)(1) (count eight); third-degree possession of a controlled dangerous substance (oxycodone), N.J.S.A. 2C:35-10(a)(1) (count nine); second-degree conspiracy to unlawfully possess a handgun, N.J.S.A. 2C:39-5 and 2C:5-2 (count ten); and third-degree attempted hindering (by conspiring with Allen-Brewer for her to locate and hide a handgun), N.J.S.A. 2C:5-1 and 2C:29-3(b)(1) (count eleven).

Allen-Brewer was charged in count eleven with third-degree attempted hindering (by aiding McQueen in hindering by secreting the handgun), N.J.S.A. 2C:5-1 and 2C:29-3(a)(3) (count twelve); and fourth-degree attempted obstruction, N.J.S.A. 2C:5-1 and 2C:29-1(a) (count thirteen).

When he granted the motion to suppress, the Law Division judge found the station house recording violated New Jersey's Wiretapping and Electronic Surveillance Control Act (Act), N.J.S.A. 2A:156A-1 to -37, and the Fourth Amendment. He reached the same conclusion regarding the tapes made at the Correctional Center. Accordingly, he granted the motions to suppress, and later granted the motion to dismiss Allen-Brewer's charges.

On appeal, the State raises the following points:

A-4391-18T1

POINT I
DEFENDANT'S RECORDED TELEPHONE CALLS ARE NOT INTERCEPTS FOR PURPOSES OF THE WIRETAP STATUTE, AND DEFENDANT HAD NO REASONABLE EXPECTATION OF PRIVACY IN CALLS THAT HE KNEW OR SHOULD HAVE KNOWN MAY BE RECORDED BY LAW ENFORCEMENT.

POINT II
THE ORDER DISMISSING ALLEN-BREWER FROM THE INDICTMENT MUST BE REVERSED BECAUSE IT WAS BASED ON THE TRIAL COURT'S ERRONEOUS SUPPRESSION OF MCQUEEN'S RECORDED TELEPHONE CALLS.

We divide our discussion into two parts. First, we address the phone calls recorded at the Correctional Center, and secondly, the phone call recorded at the police station.

I.

The facts are undisputed. As always, we address questions of law de novo. State v. Pimentel, 461 N.J. Super. 468, 480 (App. Div. 2019). We conclude that neither the Wiretap Act nor Title 3 of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2523 (2018), bars the interception of the calls McQueen made to Allen-Brewer at the Correctional Center, their recording, or the production of the recordings to the Prosecutor's Office based upon issuance of a grand jury subpoena.

As we have previously said, recordings made at correctional facilities are lawful, and are lawfully made available to a prosecuting agency or another law enforcement agency via a grand jury subpoena. This includes conversations which touch upon, or which themselves constitute, crimes. See State v. Jackson, 460 N.J. Super. 258 (App. Div. 2019), aff'd, ___ N.J. ___ (2020) (slip op. at 6).

Like in Jackson, inmates at the Correctional Center[2] are advised by way of an inmate handbook upon their arrival at the jail that telephone calls are recorded, monitored, and may subject a detainee to discipline or even prosecution. At the beginning of each call, an automated message is played reiterating that the call is monitored. Nothing in the record would cause us to doubt that the recording would have been played at the beginning of each call McQueen made to Allen-Brewer, or vice versa.

A wire communication within the scope of the Act requires an aural transfer, or the transfer of the human voice, made at a time the speaker "exhibit[s] an expectation that such communication is not subject to interception under circumstances justifying such expectation . . . ." In re Application of State for Commc'ns Data Warrants to Obtain the Contents of Stored Commc'ns from

---

[2] One of the defendants in Jackson was housed at the same correctional facility as McQueen. See 460 N.J. Super. at 266 n.2.

Twitter, Inc., 448 N.J. Super. 471, 475 (App. Div. 2017) (quoting N.J.S.A. 2A:156A-2(b)). Callers at the Correctional Center know they are being overheard and recorded.

Since State v. Fornino, 223 N.J. Super. 531 (App. Div. 1988), calls made by inmates from prison or from correctional facilities have been exempted from the Act. Since we hold, pursuant to Fornino and the cases following, that the calls from the Correctional Center are available to the State in the prosecution of these co-defendants, we reverse this portion of the suppression order. The counts of the indictment applicable to Allen-Brewer are therefore reinstated.

II.

The phone call McQueen placed at the police station presents a different quandary. McQueen had no notice that the conversation would be recorded— in fact, he was described as deliberately lowering his voice so an officer, sitting within earshot, would not overhear. His expectation of privacy was reasonable in the absence of any warning by anyone, orally or in writing, regarding the recording of the call. We do not reach the question of whether the recording of the call would violate the Wiretap Act because we find the Prosecutor's seizure of the station house recording without a warrant violated defendants' right to be free of unreasonable searches and seizures.

A-4391-18T1

"[T]he Fourth Amendment protects people, not places." State v. Ford, 278 N.J. Super. 351, 356 (App. Div. 1995) (alteration in original) (quoting Segura v. United States, 468 U.S. 796, 810 (1984)). A critical interest protected by the Fourth Amendment is "the security of one's privacy against arbitrary intrusion by the police . . . ." State v. Novembrino, 105 N.J. 95, 135 (1987) (quoting Wolf v. Colorado, 338 U.S. 25, 27 (1949)). The Fourth Amendment analysis is two-fold: first, whether the defendant has manifested a subjective expectation of privacy and, second, whether society is willing to recognize that expectation as reasonable. State v. Hinton, 216 N.J. 211, 230 (2013) (quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)). New Jersey's constitutional standard does not require a subjective expectation of privacy, only that it be reasonable. Id. at 236.

The Supreme Court's discussion of Katz[3] in State v. Stott, 171 N.J. 343 (2002), is enlightening. In Katz, the government sought to introduce recordings

_____

[3] The 9th Circuit found in United States v. Koyomejian that the Court's holding in Katz was superseded by the Electronic Communications Privacy Act of 1986 and its predecessor, the Omnibus Crime Control and Safe Streets Act of 1968. 946 F.2d 1450, 1455 (9th Cir. 1991) ("Congress's conclusion that the vague standards found in Berger and Katz offer inadequate protection for individual privacy is manifest in its enactment of statutory requirements that go substantially beyond the minimal constitutional constraints in those two cases.").

A-4391-18T1

"of the petitioner's end of telephone conversations, overheard by F.B.I. agents who had attached an electronic listening and recording device to the outside of the public telephone booth from which he had placed his calls." 389 U.S. at 348. The Court observed that a search implicates constitutional principles whenever a citizen holds a legitimate expectation of privacy in the invaded place. Stott, 173 N.J. at 354. While using a phone, even in a public booth, a citizen has a reasonable and constitutionally protected privacy expectation in the public place. "No less than an individual in a business office, in a friend's apartment, or in a taxi cab, a person in a telephone booth may rely upon the protection of the Fourth Amendment." Katz, 389 U.S. at 352. The Court, in dealing with an alleged police intrusion of a psychiatric patient's room, found helpful Justice Harlan's comments that "certain spaces otherwise 'accessible to the public' could, at times, be considered a 'temporar[y] private place' in which its 'momentary occupants' expectation of freedom from intrusion' would trigger constitutional protections." Id. at 354. Although arrested, and awaiting transport in a police station, McQueen's call was entitled to Fourth Amendment protection.

Additionally, the State must ordinarily comply with the Fourth Amendment's warrant requirement, considered "an essential check on arbitrary

government intrusions into the most private sanctums of people's lives." State v. Manning, 240 N.J. 308, 328 (2020). Warrantless searches and seizures are "presumptively unreasonable [and] the State bears the burden of demonstrating by a preponderance of the evidence that an exception to the warrant requirement applies." Id. at 329.

Through his conduct of calling while attempting to shield the conversation from a nearby officer, McQueen demonstrated at least a subjective expectation of privacy entitled to the additional protection of the Fourth Amendment. His expectation of privacy should be one "that society is prepared to recognize as reasonable." State v. Evans, 175 N.J. 355, 369 (2003) (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

A police station is a different institutional environment than a prison or correctional center. It is not an agency such as a jail or prison, whose sole purpose is to house those either awaiting disposition of criminal charges, or who have already been convicted, and are awaiting or serving sentences.

Ordinary citizens enter police stations for a variety of reasons—not just because they have been arrested. Examples include applicants for gun permits, victims of crime and their friends and families, and families and friends of arrestees. All would reasonably assume in the absence of notice to the contrary,

that use of the police station phone is as private as if on their own phone, and certainly not taped. The record does not establish a reason to distinguish between McQueen's use of the phone and the use by a civilian.[4]

McQueen was under arrest in a police station, but in the absence of notice, he had no reason to doubt his call was as private and secure as if he was using a phone in a friend's apartment. See In re State Police Litigation, 888 F. Supp. 1235, 1256 (D. Conn. 1995) (holding that, under the Fourth Amendment, in the absence of proof of notice, "surreptitious recording of unprivileged but private calls, if proven, involves an invasion of privacy that far outweighs" any justifications for recording outgoing phone calls from police stations). Allen-Brewer, at the other end of the line, was similarly situated and she had every reason to assume her conversation was private and secure. The codefendants' subjective expectation of privacy is also objectively reasonable, and entitled to constitutional protection under these facts.

Additionally, as a matter of law, the State has not borne its burden of demonstrating, by a preponderance of the evidence "that an exception to the warrant requirement applies." See Manning, 240 N.J. at 329. McQueen was an

_____

[4] Although McQueen was likely in an area not accessible to a civilian visitor, the record is silent on the point.

arrestee who, once processed and simply waiting at the station, is sheltered by the presumption of innocence and, in the absence of some fact not present in this record, the right to be free under the Fourth Amendment from unreasonable searches and seizures.

In our colleague's dissent, he relies upon the "general public['s]" knowledge that phone calls from a police station are routinely recorded, and that therefore, no reasonable expectation of privacy exists. We do not agree that such knowledge, given this record, should be imputed either to defendant, who tried to prevent his conversation from being overheard, to Allen-Brewer, whose understanding of the circumstances of the call can only be guessed at, or to the general public.

We also reject the notion that had we reached the wiretap issue, federal law would support the ready availability to law enforcement of the station house tape in the absence of notice. See Amati v. City of Woodstock, 176 F.3d 952, 955 (7th Cir. 1999) (refusing to interpret the "ordinary course of business" exception to the federal wiretap statute to cover investigative recordings of telephone conversations from police stations); In re State Police Litigation, 888 F. Supp. 1235, 1265-66 (D. Conn. 1995) (rejecting the state's provided law enforcement purposes for recording all outgoing phone calls from police

barracks; holding that any analysis of the federal wiretap statute should not be limited to the purpose of the recording, "but to the character of the conversation intercepted"); Bohach v. City of Reno, 932 F. Supp. 1232, 1235 (D. Nev. 1996) (citations omitted) ("Finally, and more generally, we note that police stations often record all outgoing and incoming phone calls, 'for a variety of reasons . . . .' This may or may not violate the wiretapping statutes, depending upon how it is done."); George v. Carusone, 849 F. Supp. 159, 164 (D. Conn. 1994) (recognizing the implied consent exception to the wiretap statute applied to the plaintiff police officers who knew all incoming and outgoing phone calls at the police station were recorded but not to the arrestee who used the phone while detained).

Thus, the "seizure" of the conversation was a violation of McQueen and Allen-Brewer's right to be free of unlawful searches and seizures. We affirm the judge's suppression of the recording made at the police station.

Reversed in part; affirmed in part; and the dismissed counts against Allen-Brewer are reinstated.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14                                                          A-4391-18T1

**DeALMEIDA, J.A.D., dissenting in part**.

I join Part I of the majority's opinion regarding the admissibility of the recordings of defendants' telephone calls while McQueen was incarcerated at the county jail. I agree that under our holding in State v. Jackson, 460 N.J. Super. 258 (App. Div. 2019), aff'd, __ N.J. __ (2020), there is no statutory or constitutional bar to admission of the county jail recordings. I also agree that in light of the admissibility of the county jail recordings, there is sufficient evidence to support the indictment against Allen-Brewer, warranting reversal of the trial court order dismissing the indictment.

I respectfully disagree, however, with Part II of the majority opinion concluding the recording of defendants' telephone call while McQueen was in custody at the police station violated the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution. The majority holds that McQueen's expectation of privacy when making the police station call was reasonable because he was not given a written or oral warning the call would be recorded. I respectfully disagree with the proposition that the absence of a written or oral warning is dispositive of the question of the reasonableness of McQueen's expectation of privacy. After considering the totality of the circumstances, I conclude McQueen, under arrest, having recently confessed to criminal activity,

and aware he was about to be transported to the county jail, could not reasonably have expected his call to an alleged co-conspirator on a police department telephone with a detective present in the room would be private. I reach this conclusion despite the lack of oral or written notice to McQueen that the telephones at the police station were recorded, which I consider to be one factor in a multi-factor analysis.

The following facts are not disputed: McQueen was under arrest when he was transported to the police station. While at the station, he made incriminating admissions to investigating officers with respect to eluding police and falsely reporting his car stolen. After McQueen was told he was about to be transported to the county jail, he asked to use a landline telephone in the police station. The telephone McQueen used is in a room in which officers write reports. According to the State, the room is not open to the public. A detective was present in the room during at least a portion of McQueen's call, but could not hear what he said. During the call, McQueen mumbled to hide the contents of his conversation. McQueen's call, like all calls made on station house telephones, was recorded. The State concedes McQueen was not provided oral or written notice the police station telephones were recorded.

A-4391-18T1

"In determining the reasonableness of an expectation of privacy . . . , we start from the premise that '[e]xpectations of privacy are established by general social norms.'" State v. Hempele, 120 N.J. 182, 200 (1990) (alteration in original) (quoting Robbins v. California, 453 U.S. 420, 428 (1981) (plurality opinion), overruled on other grounds, United States v. Ross, 456 U.S. 798 (1982)). As I see it, McQueen's expectation that his conversation on a police station telephone was private was not "one that society is prepared to recognize as reasonable." State v. Evers, 175 N.J. 355, 369 (2003) (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

I agree with Judge Posner's observation that

> [i]t is routine, standard, hence "ordinary" for all calls to and from the police to be recorded. Such calls may constitute vital evidence or leads to evidence, and monitoring them is also necessary for evaluating the speed and adequacy of the response of the police to tips, complaints, and calls for emergency assistance.
>
> [Amati v. City of Woodstock, 176 F.3d 952, 954 (7th Cir. 1999).]

This "routine and almost universal" practice is "well known in the industry and in the general public . . . ." Adams v. City of Battle Creek, 250 F.3d 980, 984-85 (6th Cir. 2001); see also Walden v. City of Providence, 596 F.3d 38, 54-55 (1st Cir. 2010). Given the general knowledge that police department telephones

3

are recorded, notice is implied. "[W]hat is ordinary is apt to be known; it imports implicit notice." Amati, 176 F.3d at 955.

In addition, I respectfully disagree with the premise, upon which the majority bases its holding, that members of the public, not under arrest but present in a police station, to whom the majority reasons McQueen should be treated equally, would reasonably assume in the absence of notice to the contrary, that use of the station house phone is as private as if using their own phone. As I see it, the opposite is true. It would be unreasonable for a member of the public who happens to be present at a police station and who elects to use the telephone of a law enforcement agency to expect that their call would be private. In the hypothetical posed by the majority, the caller has voluntarily decided to use a law enforcement asset, which is routinely recording calls for a variety of legitimate purposes associated with the agency's ordinary business, to make a personal call. In my view, society is not prepared to accept that these circumstances are the equivalent of a person using their own phone. Our constitutional privacy protections are designed to prevent police agencies from intruding into protected realms of personal behavior. Surely, a person who decides to use a police station's telephone must reasonably expect that they have

altered the privacy protection equation and voluntarily subjected their call to potential routine surveillance.

Moreover, McQueen was not a member of the public who happened to be in the police station and in need of a telephone to make a personal call and should not necessarily be treated as if he were. He was under arrest for crimes to which he confessed, about to be transported to the county jail, and in a non-public room to which detectives had ready assess or were present. See State v. Legette, 227 N.J. 460, 469 (2017) (noting that "the privacy rights of an individual who is placed under lawful arrest are diminished") (quoting State v. Bruzzese, 94 N.J. 210, 232 (1983)). McQueen did not use the police station's telephone to call his attorney, which the State concedes would have been a protected communication, or to contact a family member. He used the police department's telephone to call an alleged co-conspirator to urge her to remove evidence of his criminal acts. In my view, society is not prepared to accept McQueen's professed expectation that this call was private, even in the absence of oral or written notice that the police station telephones were routinely recorded. See Siripongs v. Calderon, 35 F.3d 1308, 1319-20 (9th Cir. 1994) (holding no reasonable expectation of privacy where police surreptitiously recorded defendant's telephone call while defendant was in custody at police station); United States

v. Correa, 154 F. Supp. 2d 117, 123 (D. Mass. 2001) ("The defendant had no reasonable expectation of privacy in the phone call he made from the police station, while under the visible watch of a police officer.").[1]

Nor do I view McQueen's circumstances as the equivalent of an involuntarily committed patient at a psychiatric hospital, who has a privacy interest in portions of the hospital room he occupied for a long period of time. State v. Stott, 171 N.J. 343, 355 (2002) (noting defendant's "hospital room is more akin to one's home than to one's car or office. It is a place to shower, dress, rest, and sleep."). An arrestee's temporary holding, while awaiting transport to jail, in a room used by police officers to write reports is dissimilar to a patient's long-duration stay in a hospital room which "had many of the attributes of a private living area" which "had served as such a place throughout [the patient's] occupancy." Id. at 356. I, therefore, respectfully disagree with the majority's reliance on that precedent. Similarly, in my view, a non-public room in a police

---

[1] I question whether oral or written notice to McQueen at the police station would have made a difference here. A few hours after the police station call, McQueen was in the county jail where he was provided with written notice that telephone calls were recorded, as well as a verbal reminder of recording at the start of each call. Yet, he made a series of calls on the jail's recorded line further implicating himself and Allen-Brewer in criminal activity.

A-4391-18T1

station is not like a public phone booth from which a person can reasonably expect to make a private call. See Katz, 389 U.S. 347.

Allen-Brewer also had no reasonable expectation of privacy in the police station telephone call. During the call, McQueen informed Allen-Brewer he was "locked up." In my view, the unequivocal import of that statement is that McQueen was in the custody of law enforcement personnel, either at a police station or county jail. Allen-Brewer could not reasonably have expected that her conversation with McQueen in such circumstances would be private.

In addition, even if Allen-Brewer was not aware McQueen was in police custody, his voluntary use of the police station phone based on his unreasonable expectation of privacy negated any privacy interest she may have had in their conversation. When "one party makes [a] conversation available to others, such as through the use of a speaker phone or by permitting someone else to hear, . . . the privacy interest does not remain the same." State v. Hunt, 91 N.J. 338, 346 (1982). "There is no constitutional protection for misplaced confidence or bad judgment when committing a crime." Evers, 175 N.J. at 370. Allen-Brewer could not reasonably rely on McQueen protecting the confidentiality of the contents of their call on the police station telephone.

Because the majority concluded the recording of defendants' conversation on the police station telephone violated constitutional provisions protecting privacy, it did not reach the question of whether the recording violated the New Jersey Wiretapping and Electronic Surveillance Control Act (the Wiretap Act), N.J.S.A. 2A:156A-1 to -37, or Title III of the Federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. My review of these provisions and the legal precedents interpreting them reveal no statutory bar to admission of the recording of the police station call.

The two statutes prohibit the interception of wire communications, including telephone calls, as well as the disclosure or use of the contents of any intercepted wire communication. N.J.S.A. 2A:156A-3, -8; 18 U.S.C. §§ 2511, 2516, 2517; see State v. Worthy, 273 N.J. Super. 147, 150 (App. Div. 1994) (acknowledging it is well-established that telephone conversations are wire communications), aff'd, 141 N.J. 368 (1995). Under both statutes, "'[i]ntercept' means the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device." N.J.S.A. 2A:156A-2(c); 18 U.S.C. § 2510(4). "'[E]lectronic, mechanical, or other device' means any device or apparatus . . . that can be used

to intercept a wire, electronic or oral communication . . . ." N.J.S.A. 2A:156A-2(d); accord 18 U.S.C. § 2510(5).

The statutes, however, exclude from the definition of "electronic, mechanical, or other device" "[a]ny telephone or telegraph instrument, equipment or facility, or any component thereof . . . being used . . . by an investigative or law enforcement officer in the ordinary course of his duties . . . ." N.J.S.A. 2A:156A-2(d)(1); 18 U.S.C. § 2510(5)(a)(ii). This exception, known as the law-enforcement exception, "appl[ies] to telephone equipment used by law enforcement officers in the ordinary course of their duties, regardless of whether the monitoring on a particular occasion is random or is done by an officer who regularly performs that duty." State v. Fornino, 223 N.J. Super. 531, 545 (App. Div. 1988). Because an interception occurs only when an intercepting device is used, the use of an excluded device is not an interception at all under the statutes. Id. at 544-45.

Our courts have held that the routine recording of inmate conversations on telephones in county jails are not interceptions under either the Wiretap Act or Title III. Jackson, 460 N.J. Super. at 273. We have not, however, addressed the question of whether recorded conversations on a police station telephone by a detainee in police custody fall within the exception in the two statutes. Federal

precedents, to which we look for guidance when interpreting the Wiretap Act, In re Application of State for Commc'ns Data Warrants, 448 N.J. Super. 471, 480 (App. Div. 2017), conclude the routine recording of police station telephone conversations fits within the law-enforcement exception. See Walden, 596 F.3d at 54-55; Adams, 250 F.3d at 984-85; Amati, 176 F.3d at 954.

The plain language of the statutes unequivocally exempt the recording at issue here. It is undisputed that all of the telephone calls to and from the police station are recorded as part of the ordinary duties of an officer of the police department, an investigative and law enforcement agency. The Wiretap Act and Title III are not applicable to the recording of defendants' conversation on the police station telephone.

In addition, because the recording of the police station telephone is not an interception under the Wiretap Act or Title III, neither statute restricts the police department's authority to disclose the contents of the recording to the county prosecutor, as was done here. See United States v. Lewis, 406 F.3d 11, 19-20 (1st Cir. 2005) (finding, because recordings of jail calls are not interceptions, Title III's restrictions on the use of intercepted communications does not apply).

Even if the statutes applied to the recording or sharing of the recording of the call,

[a]ny investigative or law enforcement officer or other person who, by any means authorized by this act, has obtained knowledge of the contents of any wire, electronic or oral communication, or evidence derived therefrom, may disclose or use such contents or evidence to investigative or law enforcement officers of this or another state, or any of its political subdivisions, . . . to the extent that such disclosure or use is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

[N.J.S.A. 2A:156A-17(a); accord 18 U.S.C. § 2517 (1).]

Defendants, therefore, have not raised any cogent argument that the recording, production, or use of their call on the police station telephone was unlawful.

For these reasons, I respectfully dissent from Part II of the majority opinion and would reverse the trial court order to the extent it suppresses the recording of defendants' telephone conversation on the police station telephone.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4391-18T1