**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3326-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

IBE ALLAH-JR., a/k/a
IBE ALLAH and
IBE O. ALLAH, JR.,

     Defendant-Appellant.

_____

Argued November 29, 2023 – Decided August 14, 2024

Before Judges Vernoia, Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 21-01-0025.

Lucas B. Slevin, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Lucas B. Slevin, of counsel and on the briefs).

Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County

Prosecutor, attorney; Nancy A. Hulett, of counsel and on the brief).

Nathaniel Levy, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Angela Cai, Deputy Solicitor General, David Chen, Deputy Attorney General, and Nathaniel Levy, of counsel and on the brief).

PER CURIAM

Defendant Ibe Allah-Jr. appeals from his conviction and sentence for possessory drug and weapons offenses. He argues the court erred by denying his motion to suppress physical evidence, admitting improper lay- and expert-opinion testimony, and imposing an excessive sentence based in part on an improper consideration and weighing of statutory factors. He also argues he is entitled to a reversal of his conviction due to improper statements made by the prosecutor during closing arguments and because his weapons conviction violates the Second Amendment of the United States Constitution. Having considered defendant's arguments, the State's opposition, and the applicable law, we affirm defendant's conviction, vacate the order denying defendant's suppression motion, and remand for further proceedings on defendant's suppression motion and for the court to correct errors in the judgment of conviction and to determine if defendant is entitled to an additional day of jail

credit on his sentence.

I.

The charges against defendant resulted from New Brunswick Police Department Detective Brandt Gregus's investigation of a confidential informant's report that an individual, who was later identified as defendant, was distributing drugs on a New Brunswick street corner. According to Detective Gregus, at around 9:00 a.m. on August 9, 2019, he undertook surveillance of the corner at the intersection of Lee Avenue and Seaman Street and observed defendant engage in two separate exchanges of wax folds of heroin for cash: one with an individual who had approached defendant in a vehicle and the other with an individual whom defendant had approached on foot.

With the aid of binoculars and from his surveillance vantage point, Detective Gregus observed that during the first transaction with the individual in the vehicle, defendant first spoke to the individual and then walked across the street where he bent down and looked into one of two black plastic bags that were located next to a fence near a public sidewalk in front of a residence. Detective Gregus testified he saw defendant retrieve heroin from one of the plastic bags, return to and enter the vehicle, and hand the heroin to the individual in the vehicle in exchange for money. Detective Gregus testified defendant then

exited the vehicle and walked across the street where minutes later he approached a man wearing a blue shirt who gave defendant cash in exchange for "bags of heroin."

Following each transaction, Detective Gregus reported what he had seen to another officer, who was located nearby in a vehicle. Detective Gregus described the vehicle involved in the first transaction to the other officer for the purpose of having the officer conduct a motor-vehicle stop, but the officer could not locate the vehicle after it departed from the scene of the transaction. Similarly, following his observation of the transaction between defendant and the man in the blue shirt, Detective Gregus provided a description of the man to the other officer, who sought to stop the man but could not locate him.

Detective Gregus briefly left the location where he had made his observations of the transactions and met with the other officer. They returned to the intersection where defendant had engaged in the transactions, and detained defendant. Detective Gregus crossed the street and seized the two black plastic bags. One bag contained 164 wax folds of heroin and the other bag contained a nine-millimeter handgun with a large-capacity magazine loaded with thirteen rounds of ammunition; one round was in the chamber and two rounds were determined to be hollow-point bullets. The officers arrested defendant and,

 A-3326-21

during a search incident to his arrest, seized a large amount of cash and a cell phone from him.

A grand jury returned an indictment[1] charging defendant with third-degree possession of a controlled dangerous substance (CDS) (heroin), N.J.S.A. 2C:35-10(a)(1) (count one); third-degree possession of a CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3) (count two); second-degree possession of a CDS with intent to distribute within 500 feet of public property, N.J.S.A. 2C:35-5(a) and 2C:35-7.1 (count three); third-degree possession of a CDS with intent to distribute within 1,000 feet of a school property, N.J.S.A. 2C:35-5(a) and 2C:35-7 (count four); second-degree unlawful possession of a weapon (handgun), without having obtained a permit to carry under N.J.S.A. 2C:58-4, N.J.S.A. 2C:39-5(b) (count five); fourth-degree possession of a prohibited device (body armor piercing ammunition), N.J.S.A. 2C:39-3(f) (count six); fourth-degree unlawful possession of a large-capacity ammunition magazine, N.J.S.A. 2C:39-3(j) (count seven); second-degree possession of a firearm while possessing a CDS with intent to distribute under N.J.S.A. 2C:35-5, N.J.S.A. 2C:39-4.1 (count eight); third-degree receiving stolen property (the handgun),

---

[1] We refer to the January 2021 superseding indictment because it included the charges for which defendant was tried.

N.J.S.A. 2C:20-7 (count nine); and third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25 (count ten).

Following the indictment, defendant moved to suppress the physical evidence—the handgun, magazine, and heroin—seized from the plastic bags.[2] The court held an evidentiary hearing during which Detective Gregus was the sole witness. Detective Gregus testified concerning his surveillance of defendant on the street corner, his observations of the two suspected transactions, his observations of defendant's retrieval of wax folds of suspected heroin from one of the black plastic bags, his recovery and seizure of the black plastic bags, his discovery and seizure of the handgun, magazine, and heroin from the bags, and defendant's arrest.

The State argued the court should deny defendant's suppression motion, claiming defendant did not have a reasonable expectation of privacy in the plastic bags because they had been placed against a fence and near a public sidewalk across from the street corner where defendant had allegedly engaged in the suspected transactions. The State also argued the search was proper under

---

[2]  Defendant did not move to suppress the evidence seized from his person following his arrest.

A-3326-21

the plain-view exception to the warrant requirement because Detective Gregus had seen defendant pull wax folds of heroin from the bags.

The court denied the motion, finding defendant did not have a reasonable expectation of privacy in the plastic bags because they had been placed outside the fence of the residence, were close to a sidewalk, and "were accessible to anyone." Based on those findings, the court found the search of the bags "was . . . completely justified." The court further determined it was therefore unnecessary to consider the State's argument that the search of the bags was proper under the plain-view exception to the warrant requirement. The court entered an order denying the suppression motion.

Prior to defendant's trial, the court also conducted a N.J.R.E. 104 hearing on the admissibility of testimony from Middlesex County Prosecutor's Office (MCPO) Detective Michael Metz as the State's proposed expert witness in street-crimes terminology. The State had advised defendant it intended to call Detective Metz to provide expert testimony concerning slang used by defendant in text messages that had been obtained from a search of the cell phone found in his possession when he was arrested.

Over defendant's objection, the court qualified Detective Metz as an expert in street-crimes terminology. The court further determined Detective

Metz could testify at trial that certain words—slang—used in text messages found on defendant's cell phone referred to illicit drugs and a handgun.

During the trial, the court dismissed counts six and ten, which charged defendant with fourth-degree possession of body armor piercing ammunition, and third-degree financial facilitation of criminal activity, respectively. The jury found defendant not guilty of third-degree possession of a CDS with intent to distribute (count two); second-degree possession of a CDS with intent to distribute within 500 feet of public property (count three); third-degree possession of a CDS with intent to distribute within 1,000 feet of school property (count four); second-degree possession of a firearm while possessing a CDS with intent to distribute (count eight); and third-degree receiving stolen property—the handgun (count nine).

The jury found defendant guilty only of the possessory drug and weapons offenses: third-degree unlawful possession of a CDS, heroin (count one), second-degree unlawful possession of handgun (count five), and fourth-degree unlawful possession of a large-capacity magazine (count seven). The court sentenced defendant to an aggregate seven-year sentence with the requirement that he serve forty-two months without eligibility for parole as required under the Graves Act, N.J.S.A. 2C:43-6.2(c).

Defendant appealed from the order denying his suppression motion and from his conviction and sentence. He presents the following arguments for our consideration:

> POINT I
>
> THE COURT ERRED IN DENYING THE SUPPRESSION MOTION BY APPLYING FEDERAL STANDING RULES IN VIOLATION OF <u>ALSTON</u>,[3] AND BECAUSE THE ABANDONMENT EXCEPTION DOES NOT APPLY.
>
> A. In Denying [Defendant]'s Suppression Motion, The Trial Court Applied The Wrong Legal Test, Incorrectly Relying On Federal Standing Rules To Deprive [Defendant] of The Automatic Standing He Is Entitled [to] Under New Jersey Law.
>
> B. The State Failed To Establish That The Bags Were Abandoned.
>
> POINT II
>
> DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE ADMISSION OF "SLANG" EXPERT TESTIMONY WHERE THE WITNESS LACKED THE EXPERIENCE AND RELIABILITY REQUIRED UNDER N.J.R.E. 702, AND BY THE PROSECUTOR'S IMPROPER COMMENTS IN SUMMATION OPINING ON THE CREDIBILITY AND VERACITY OF THE EXPERT'S CONCLUSIONS.

---

[3] <u>State v. Alston</u>, 88 N.J. 211 (1981).

A. Because The State Did Not Demonstrate That Detective Metz Possessed Specialized Knowledge And Employed A Reliable Methodology, The Court Erred By Allowing Him To Opine As An Expert On The Purportedly Incriminating Meaning Of Text Messages, In Violation Of N.J.R.E. 702.

1. Detective Metz Lacked The Specialized Expertise Required Under The Third Prong of N.J.R.E. 702.

2. Detective Metz's Testimony Did Not Meet the Reliability Prong of N.J.R.E. 702 Because He Did Not Employ Reliable Principles or Methodologies.

B. The Prosecutor's Improper Summary of Metz's Testimony Compounded The Prejudice Of Its Admission By Relying on Facts Beyond Those Presented to the Jury To Express Her Professional Opinion On Metz's Veracity.

C. These Errors, Together And Independently, Denied [Defendant] Due Process And A Fair Trial, Requiring Reversal.

POINT III

DEFENDANT WAS DENIED DUE PROCESS AND THE RIGHT TO CONFRONTATION BY THE ADMISSION OF IMPROPER LAY OPINION TESTIMONY THAT DEFENDANT WAS THE AUTHOR OF TEXT MESSAGES AND THAT THESE MESSAGES HAD "EVIDENT[I]ARY VALUE" TO THE STATE'S PROSECUTION.

POINT IV

THE CUMULATIVE IMPACT OF THE OFFICERS' INADMISSIBLE OPINION TESTIMONY

10

COMPOUNDED BY PROSECUTORIAL MISCONDUCT DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT V

DEFENDANT'S CONVICTIONS FOR POSSESSION OF A FIREARM WITHOUT A PERMIT AND A LARGE CAPACITY AMMUNITION MAGAZINE MUST BE VACATED BECAUSE NEW JERSEY'S FIREARM LICENS[]ING LAWS AND AMMUNITION DEVICE PROHIBITIONS ARE FACIALLY UNCONSTITUTIONAL UNDER BRUEN.[4]

A. [Defendant]'s Conviction For Possession Of A Handgun Without A Permit To Carry Must Be Vacated Because The New Jersey Law Precluding Persons Between The Age Of [Eighteen] And [Twenty-One] From Obtaining A Permit To Carry A Handgun Violates The Second And Fourteenth Amendments.

B. [Defendant]'s Conviction for Possession of Large Capacity Ammunition Magazine Must Be Vacated Because The New Jersey Law Criminalizing Possession Of Such Devices Violates The Second and Fourteenth Amendments.

POINT VI

RESENTENCING IS REQUIRED BECAUSE THE JUDGMENT OF CONVICTION CONTAINS ERRORS, AND THE COURT IMPROPERLY CONSIDERED A PREVIOUSLY DISMISSED CHARGE, ACCORDED EXCESSIVE WEIGHT TO AN AGGRAVATING FACTOR, AND DENIED

---

4  N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022).

DEFENDANT JAIL CREDIT WHICH HE IS ENTITLED TO RECEIVE.

A. The Sentence On The Judgment of Conviction For Count Seven Is Incorrect.

B. [Defendant] is Entitled to [One] Day of Jail Credit For The Time He Was Incarcerated Prior To Sentencing And Not Serving A Sentence for a Parole Violation.

C. Resentencing is Required Because the Court Improperly Considered a Previously Dismissed Charge.

D. [Defendant]'s Aggregate Sentence Of Seven Years With [Forty-Two] Months Parole Disqualifier Is Manifestly Excessive.

II.

We first consider defendant's claim the court erred by denying his motion to suppress the heroin, handgun, and magazine Detective Gregus had found within the two black plastic bags. Our review of defendant's argument is guided by the following well-established principles.

"We review the trial court's determination of [a] defendant's motion to suppress under a deferential standard." State v. Miranda, 253 N.J. 461, 474 (2023). "Appellate courts reviewing a grant or denial of a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014). We accord deference to such factual findings

12

because they "'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Elders, 192 N.J. 224, 244 (2007)).

We reverse only when the trial court's determination is "'so clearly mistaken "that the interests of justice demand intervention and correction."'" Ibid. (quoting Elders, 192 N.J. at 244). "We review de novo the trial court's legal conclusions and its determination of the consequences that flow from established facts." Miranda, 253 N.J. at 475 (citing State v. Nyema, 249 N.J. 509, 526-27 (2022); State v. Hubbard, 222 N.J. 249, 263 (2015)).

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect against "unreasonable searches and seizures" and generally require a warrant issued upon "probable cause." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "[A] warrantless search is presumptively invalid" unless the State establishes the search falls into "'one of the "few specifically established and well-delineated exceptions to the warrant requirement."'" State v. Gonzales, 227 N.J. 77, 90 (2016) (quoting State v. Edmonds, 211 N.J. 117, 130 (2012)).

Where a defendant moves to suppress evidence seized without a warrant, the State bears the "burden, by a preponderance of the evidence, to establish" an

exception to the warrant requirement applies and that "the warrantless search or seizure of an individual was justified in light of the totality of the circumstances." State v. Bard, 445 N.J. Super. 145, 155-56 (App. Div. 2016) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). "[T]he touchstone for evaluating whether police conduct has violated constitutional protections is reasonableness. The reasonableness of police conduct is assessed with regard to circumstances facing the officers, who must make split second decisions in a fluid situation." Id. at 157 (citations and internal quotation marks omitted).

Defendant claims the court erred by denying his motion to suppress evidence—the heroin, handgun, and magazine—found in the two black plastic bags that were seized at the time of his arrest. The court denied the motion, reasoning that because the bags "were located in [a] public space" that "was accessible to anyone," defendant did not have a reasonable expectation of privacy in the bags such that Detective Gregus's discovery of the contraband in the bags violated any constitutional requirements.

Defendant argues the court erred because it incorrectly applied federal rules concerning standing in its analysis of defendant's claim that Detective Gregus's discovery of the contraband in the bags constituted a warrantless search that was not supported by any exception to the warrant requirement. Defendant

also argues he had a reasonable expectation of privacy in the opaque black plastic bags under our Supreme Court's decision in State v. Hempele, 120 N.J. 182 (1990), and for that reason the court erred by finding he had lacked a reasonable expectation of privacy such that Detective Gregus's discovery of the contraband in the bags survives constitutional scrutiny.

Prior to addressing the merits of the parties' contentions, it is necessary to first note that in its brief on appeal, the State posits that the trial court's finding that defendant lacked a reasonable expectation of privacy in the plastic bags is "not legally defensible or sustainable." That is, the State concedes defendant's argument that the motion court erred by finding he had lacked a reasonable expectation of privacy in the plastic bags and, for that reason, the putative warrantless search of the bags was unlawful unless supported by an exception to the warrant requirement. See generally State v. Evers, 175 N.J. 355, 368-69 (2003) (explaining that to establish violations of the Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution, a "defendant must show that a reasonable or legitimate expectation of privacy was trammeled by government authorities").

We are not bound by the State's concession, State v. Jones, 445 N.J. Super. 555, 565 (App. Div. 2016), and we otherwise find it is not well-grounded based

on the legal principles relied on by the State. Thus, although we agree the court erred by denying the suppression motion based on its finding defendant had lacked a reasonable expectation of privacy in the plastic bags, we do so for reasons different than those supporting the State's concession.

In making its concession, the State cited our Supreme Court's discussion in State v. Randolph about an individual's reasonable expectation of privacy in the context of its analysis of a defendant's standing to challenge a search or seizure of evidence—contraband—supporting pending possessory offenses, such as unlawful possession of a CDS, firearm, or weapon. 228 N.J. 566, 571-72 (2017); see also State v. Gartrell, 256 N.J. 241, 254 (2024) (noting an individual's reasonable expectation of privacy is not pertinent to a determination of standing). The State's reliance on Randolph to support its concession is misplaced. The trial court's finding defendant lacked a reasonable expectation of privacy was not made in an analysis of defendant's standing. Nor should it have been, given that, as the Court declared in Randolph, New Jersey's automatic standing rule "eliminates any inquiry into [a] defendant's reasonable expectation for privacy." 228 N.J. at 572.

"Under the automatic standing rule, virtually all defendants have standing to contest a search or seizure by police where they have either 'a proprietary,

16

A-3326-21

possessory or participatory interest in either the place searched or the property seized.'" Lamb, 218 N.J. at 313 (quoting Alston, 88 N.J. at 228). Pertinent here, under the automatic standing rule, a defendant also has standing to challenge a search or seizure of evidence "if 'possession of the seized evidence at the time of the contested search is an essential element of guilt.'" Ibid. (quoting Alston, 88 N.J. at 228). Thus, there is no dispute defendant had standing to challenge the discovery and seizure of the contraband from the plastic bags.

The trial court appropriately considered defendant's reasonable expectation of privacy in the context of an inquiry wholly separate from the issue of standing: whether Detective Gregus's discovery of the contraband in the bags violated defendant's constitutional right to be free from unreasonable searches and seizures. As the Court explained in Randolph, it is unnecessary to engage in a reasonable-expectation-of-privacy analysis in determining a defendant's standing where a defendant "has automatic standing to challenge a search," but the analysis is nonetheless necessary to determine if "a defendant has a protectable Fourth Amendment and Article 1, Section 7 right to privacy in a novel class of objects or category of places." 228 N.J. at 583-84; see State v. Johnson, 193 N.J. 528, 547 (2008) (explaining a reasonable-expectation-of-privacy analysis is not required to determine standing in criminal cases but is

17

applied "to determine whether a person has a substantive right of privacy in" the place or an item seized). Stated differently, a determination of a defendant's standing is an "inquiry [that] is separate and distinct from the question" of "whether [a] defendant possesses a reasonable expectation of privacy" in the evidence. State v. Hinton, 216 N.J. 211, 234 (2013).

Although the State concedes the court erred by denying defendant's suppression motion based on his alleged lack of a reasonable expectation of privacy in the plastic bags, the State appears to have done so only as to the issue of defendant's standing, which is not in dispute here, and without reference to whether defendant's claim the recovery of the contraband violated his constitutional rights to be free from unreasonable searches and seizures. See ibid.; see also Randolph, 228 N.J. at 582. It is therefore appropriate to consider the merits of the court's determination that defendant lacked a sufficient reasonable expectation of privacy in the plastic bags such that his constitutional rights to be free from unreasonable searches and seizures were not violated by Detective Gregus's discovery of the contraband in the black plastic bags.

In support of its determination defendant lacked a reasonable expectation of privacy in the bags, the court principally relied on our decision in State v. Ford, which upheld the validity of an officer's search of a hole in the side of a

18

home that yielded a clear large plastic bag containing smaller clear plastic bags of cocaine.  278 N.J. Super. 351, 354-55 (App. Div. 1995).  We found the defendant had forfeited his right to privacy in the place the large bag was found because he had been seen in public view—by officers surveilling the home—removing suspected cocaine from the large bag for distribution and then secreting the bag in the hole in the side of the residence.  Id. at 356.  Based on those facts, we found the defendant did not have a reasonable expectation of privacy in the hole where the defendant had been observed in public view secreting the large clear bag such that his rights were violated by the seizure of the bag from that location.  Id. at 355.

Here, the trial court reasoned Ford supported its determination defendant did not have a reasonable expectation of privacy in the plastic bags in which the heroin, handgun, and magazine were found.  The court found the plastic bags had been placed by defendant along a public sidewalk and roadway such that "there could be no reasonable expectation of privacy . . . in keeping the bags" at that location.  For that reason alone, the court denied defendant's suppression motion.

The court's reliance on Ford is misplaced.  In Ford, the validity of the search turned on whether the police had a proper basis to conduct a warrantless

19

seizure of the suspected contraband that had been hidden in the hole.  Id. at 354-55.  The defendant in Ford did not challenge the validity of the search of the large bag after it had been seized from the hole, and we therefore were not required to determine the defendant's reasonable expectation of privacy in that bag after it had been seized.  Id. at 356-57.

Defendant presents a different issue here.  He does not challenge Detective Gregus's seizure of the plastic bags from their location on the ground next to the fence, and he concedes the seizure of the bags was proper because they were in plain view.  He challenges only Detective Gregus's discovery of the contents of the bags, asserting that once they had been seized, any putative search of the bags required either a warrant or support in an exception to the warrant requirement.  See, e.g., State v. Premone, 348 N.J. Super. 505, 512 (App. Div. 2002) (explaining a police "officer's authority to possess a package is distinct from his [or her] authority to examine its contents" (quoting Walter v. United States, 447 U.S. 649, 654 (1980))).

In Ford we reasoned the defendant did not have a reasonable expectation of privacy in instrumentalities of crime that were hidden while under the gaze of law enforcement, 278 N.J. Super. at 355, because the Supreme Court in Hempele had approved the "maxim"—"'the police cannot reasonably be

expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public.'"  120 N.J. at 209 (quoting California v. Greenwood, 486 U.S. 35, 41 (1988)).  The court in Ford correctly stated the Supreme Court in Hempele had approved the maxim—finding it "obviously true," Hempele, 120 N.J. at 209—but the court in Ford did not consider that in Hempele the Supreme Court also found the maxim "hardly relevant," ibid., to a determination of an individual's reasonable expectation of privacy, Ford, 278 N.J. Super. at 355.

In Hempele, the Court explained that the "more appropriate" statement concerning an individual's reasonable expectation of privacy is:  "[w]hat a person . . . seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  120 N.J. at 210 (quoting Katz v. United States, 389 U.S. 347, 351-52 (1967)).  In finding individuals have a reasonable expectation of privacy in garbage bags placed at the curb for pick up, the Court noted that although the "bags are placed in areas accessible to the public, the contents are not exposed to the public" and that "[b]y enclosing their trash in opaque bags, people can maintain the privacy of their garbage even though they may place them in an area accessible to the public."  Ibid. (emphasis in original).

The Court further explained the State constitutional prohibition against unreasonable searches and seizures, see N.J. Const. art. I, ¶ 7, "'provides protection to the owner of every container that conceals its contents from plain view.'" Hempele, 120 N.J. at 202 (quoting United States v. Ross, 456 U.S. 798, 822 (1982)). And, the "critical issue" in determining whether an individual has a reasonable expectation of privacy in a container "is whether the container conceals its contents from plain view." Id. at 203. The Court therefore concluded that "[b]ecause ordinary opaque garbage bags conceal their contents from plain view, the presumption is that an expectation of privacy in the contents is reasonable." Ibid.

Consistent with those principles, defendant had a reasonable expectation of privacy in the opaque, black plastic bags when they were seized by Detective Gregus. The court erred by concluding otherwise. The detective testified he had observed the heroin only as it was taken out of one of the bags and he could not see inside the bags after the heroin had been removed or as the bags sat on the ground prior to his seizure of them. At the time Detective Gregus seized the bags, they clearly "conceal[ed] their contents" such that defendant had a reasonable expectation of privacy in their contents. Ibid.

The State does not argue defendant had abandoned the bags such that he no longer had a reasonable expectation of privacy in their contents. See generally Gartrell, 256 N.J. at 251 (discussing the standards for determining if property is abandoned for purposes of protecting "'the privacy rights of our citizens and to deter the police from conducting unreasonable searches and seizures'" (quoting State v. Carvajal, 202 N.J. 214, 223 (2010))). The State has therefore waived any claim defendant lacked a reasonable expectation of privacy in the contents of the opaque, black plastic bags because the bags had been abandoned when they were seized by Detective Gregus.[5] See generally N.J.

---

[5] Property is deemed "abandoned only if '(1) a person has either actual or constructive control or dominion over property; (2) [the person] knowingly and voluntarily relinquishes any possessory or ownership interest in the property; and (3) there are no other apparent or known owners of the property.'" Ibid. (quoting Carvajal, 202 N.J. at 223). When it argues a defendant is without a right to challenge a search of property it claims was abandoned, the State must prove the property was abandoned by a preponderance of the evidence. Ibid.

The State tacitly acknowledges it did not satisfy that burden as to the plastic bags and their contents because, as noted, the State does not argue it met the burden and it otherwise contends the court erred by finding defendant lacked a reasonable expectation of privacy in the bags. In its brief on appeal and at oral argument, the State recognized the evidence presented at the N.J.R.E. 104 hearing on defendant's suppression motion did not establish the bags or their contents had been abandoned by defendant. And the State's only witness at the hearing testified defendant placed the plastic bags across the street from where he had allegedly sold drugs and had accessed them as part of the drug transactions. Thus, there is no evidence defendant had knowingly and voluntarily relinquished his possessory or ownership interest in the bags or that

<u>Dep't of Env't Prot. v. Alloway Twp.</u>, 438 N.J. Super. 501, 505-06 n.2 (App. Div. 2015) (finding "[a]n issue that is not briefed is deemed waived upon appeal"); <u>Drinker Biddle & Reath LLP v. N.J. Dep't of L. & Pub. Safety</u>, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (explaining issues not addressed in a party's merits brief on appeal are deemed waived).

In support of Detective Gregus's discovery of the heroin, handgun, and magazine in the plastic bags, the State argues solely that the contraband was lawfully seized under the plain-view exception to the warrant requirement. We therefore consider only whether the seizure of the contraband was supported by

---

there were no apparent owners of the bags. <u>Ibid.</u> To the contrary, the evidence established police arrested defendant and charged him with possession of the heroin, handgun, and magazine found in the bags based on Detective Gregus's understanding that the bags belonged to defendant and defendant had retained a possessory or ownership interest in them so he could engage in the alleged drug transactions.

Thus, this case is unlike <u>State v. Burgos</u>, where we concluded the defendant did not have a reasonable expectation of privacy in a tin can in which he had stashed a supply of drugs while selling them nearby. 185 N.J. Super. 424, 426-28 (App. Div. 1982). We based our decision in <u>Burgos</u> on our finding the defendant had abandoned the drugs when he placed them in the tin can and left them on the street near where he had sold the drugs. <u>Ibid.</u> In <u>Burgos</u>, we did not apply the standard for abandonment of property that presently controls the determination of that issue, <u>see generally</u> <u>Gartrell</u>, 256 N.J. at 251, and we were then without the guidance concerning a defendant's reasonable expectation of privacy later defined by the Court in <u>Hempele</u>, 120 N.J. at 209-10. Moreover, unlike in <u>Burgos</u>, the State here does not argue that defendant had abandoned the bags or was without a reasonable expectation of privacy in them. 185 N.J. Super. at 426-28.

that exception in our analysis of the court's order denying defendant's suppression motion.

As we have explained, defendant does not challenge the validity of Detective Gregus's seizure of the two plastic bags in which the contraband was found. Defendant recognizes that based on Detective Gregus's observations of defendant's participation in the suspected drug transactions and purported retrieval of suspected heroin from one of the bags, the detective had probable cause to seize the bags and that they were in plain view. See State v. Johnson, 171 N.J. 192, 207 (2002) ("'[I]n order to seize evidence in plain view a police officer must have "probable cause to associate the property with criminal activity."'" (quoting State v. Bruzzese, 94 N.J. 210, 236-38 (1983))). Defendant instead argues the search of the plastic bags following their seizure was unlawful because it took place without a warrant and in the absence of any exception to the warrant requirement.

"Plain view is one of the recognized exceptions to the warrant requirement." State v. Johnson, 476 N.J. Super. 1, 20 (App. Div. 2023). Under the plain-view exception, a warrantless seizure of evidence is proper where the State proves by a preponderance of the evidence that a police officer is "'lawfully . . . in the area where [they] observed and seized the incriminating

item or contraband, and it [is] . . . immediately apparent that the seized item is evidence of a crime.'" State v. Williams, 254 N.J. 8, 45 (2023) (emphasis omitted) (quoting Gonzales, 227 N.J. at 101).

Our Supreme Court has explained that "[t]he requisite cause for [a] search of effects can differ from the cause needed to seize them" and that separate analyses are required for each. Hempele, 120 N.J. at 216. "[T]here are important differences between the interests of citizens protected from unlawful searches and those protected from unlawful seizures that are relevant to the plain view doctrine." Johnson, 171 N.J. at 206. A seizure presents a threat to an individual's property interest and a search poses a threat to an individual's personal privacy interest. Ibid. Here, the seizure of the plastic bags—which defendant does not challenge—threatened defendant's property interest, but the search of the bags threatened his personal privacy interest and required a warrant unless the search was otherwise supported by an exception to the warrant requirement. Ibid.; see also Hempele, 120 N.J. at 216-19 (applying separate standards to determine the constitutionality of the seizure of garbage bags left for collection and the search of the bags following their seizure).

In Hempele, the Court explained that even if the search of a garbage bag properly seized is "only 'minimally intrusive' of a person's privacy, the warrant

and probable-cause requirement for garbage searches can be scrapped only if a special government interest significantly outweighs those privacy interests." 120 N.J. at 219 (quoting United States v. Place, 426 U.S. 696, 703 (1983)). The Court also rejected the notion that "the public interest in combatting the drug problem justif[ied] an exception to the warrant requirement" for searching seized garbage bags. Id. at 220. The Court held that because there was "no special . . . interest that makes the warrant requirement impracticable, . . . the State must secure a warrant based on probable cause in order to search garbage bags left on the curb for collection." Id. at 221. The Court further observed that the warrant requirement "certainly appl[ies] to opaque containers," id. at 217, such as the black plastic bags seized by Detective Gregus.

The State presented limited evidence at the suppression hearing concerning the detective's discovery of the contraband in the plastic bags. Detective Gregus testified that when he "walked up to [the] bags," "[t]hey weren't in a knot" and they were "laying there not tied up." He explained that the "handles" to the bags "were still open." When asked if he could see what was inside the bags, Detective Gregus said, "[n]ot from—if I didn't walk directly up to them, no."

Detective Gregus further testified that the first bag he had "interacted with" was the one in which he found the handgun.[6]  He explained that he had "picked it up and . . . felt the weight."  He testified that he had picked up the bag "by the handles" and found it was "heavy."  He said he had looked in the bag and saw "a black handgun" but explained it was "the act of picking [the bag] up" that "exposed the interior of the bag to [his] view."  Similarly, Detective Gregus explained that he also had picked up the second bag—in which the heroin was found—and that picking the bag up "was what exposed its contents to" him.  He did not testify, however, about the precise manner in which he picked up either bag or how he had obtained a view of each bag's contents.

On cross-examination, defense counsel inquired about the handling of the plastic bags, asking "but when you were standing over them—up close to them, you could not see inside either one?"  Detective Gregus responded, "[n]o," and explained he "didn't go up to them and try to like—I just walked up to them and I instantly picked [them] up."[7]  When asked if he "picked . . . up" and

_____

[6] Detective Gregus also testified that a report he had prepared incorrectly stated that the first plastic bag he had picked up contained the drugs, not the handgun.

[7] Although Detective Gregus used the singular term "bag" to refer to the items he picked up and then opened up, based on the context within which his testimony was given, for purposes of this opinion we interpret his testimony as stating he picked up and opened the two plastic bags.

A-3326-21

"opened . . . up" the bags, Detective Gregus said, "[y]es. . . . I picked [them] up and looked inside."

Although the court explained that it had found it unnecessary to address the State's claim the handgun and drugs were in plain view, the court made findings of fact concerning Detective Gregus's seizure of the evidence resulting from his search of the plastic bags. The court found that following the detective's observations of what he had understood were two transactions in which defendant exchanged suspected heroin for cash, and after the officers had detained defendant, Detective Gregus "went to the fence area where he [had] observed . . . defendant reach down to grab what [Detective Gregus] believed to be the heroin and there were two bags at the fence area." The court further found the plastic bags were in an area where "any member of the public could have [had] access."

The court also found Detective Gregus had "then picked up . . . the one bag contain[ing] 164 bags of heroin," and then the "second bag . . . it was a plastic bag, and although it wasn't knotted closed, it was closed."[8] The court continued, finding Detective Gregus had "picked up the bag and . . . because of

---

[8]  The court's finding is inconsistent with Detective Gregus's testimony that the first bag contained the handgun.

the weight of the bag, then he looked into it . . . and there was a . . . loaded handgun."

The court did not make any further findings of fact pertinent to a determination of whether Detective Gregus's discovery of the evidence inside the bags without a warrant was justified under the plain-view exception to the warrant requirement or resulted from a warrantless search of each bag and not from an observation in plain view. As noted, the court did not make those findings because it believed its determination defendant lacked a reasonable expectation of privacy in the bags rendered it unnecessary to address the State's proffered plain-view-exception justification for the warrantless discovery of the contraband in the bags.

We have carefully considered Detective Gregus's testimony concerning his seizure of the evidence from the bags and, without drawing any conclusions based on it, we are convinced it presents credibility and factual issues that should have been, and must be, determined by the trial court in the first instance. To correctly determine whether the testimony supports the State's claim the evidence was in plain view such that it was correctly seized from the bags without a warrant, the court necessarily had to sort through Detective Gregus's limited, and arguably vague and conflicting testimony concerning his recovery

30

of the evidence, find the facts based on the testimony it deemed credible, and determine if those facts satisfied the State's burden of proving by a preponderance of the evidence that the search of the bags and the recovery of the evidence is supported under the singular basis the State offers in support the seizure of the evidence—the plain-view exception to the warrant requirement. See Gonzales, 227 N.J. at 82.

We recognize that Rule 2:10-5 permits our exercise of "original jurisdiction as is necessary to the complete determination of any matter on review." The exercise of original jurisdiction "eliminate[s] unnecessary further litigation," but its use is "discourage[d]" where, as here, "factfinding is involved." State v. Santos, 210 N.J. 129, 142 (2012). Original jurisdiction should not be exercised where it would require this court to make "factual findings based on a hearing transcript and then weigh[] the evidence on [our] own." State v. Micelli, 215 N.J. 284, 293 (2013).

We therefore do not exercise original jurisdiction. We deem it appropriate to remand for the trial court to decide whether the discovery of the contraband and Detective Gregus's seizure of it is supported under the plain-view exception to the warrant requirement. "Out of an abundance of caution and because the trial judge here has already made a decision on the admissibility" of the

31

evidence, "we direct that this matter be assigned to a different judge" on remand for a new hearing limited solely to whether the evidence in the bags was in plain view such that the seizure of the heroin, handgun, and magazine from the bags were lawful. Id. at 294-95.

If, following the hearing, the remand court determines the discovery and seizure of some or all of the contraband in the bags is not supported under the plain-view exception to the warrant requirement, the court shall suppress the evidence unlawfully seized, set aside defendant's convictions, and conduct a retrial if required. If the court determines the discovery and seizure of the contraband was proper under the plain-view exception to the warrant requirement, it shall enter an order to that effect from which defendant may file a timely appeal. Our remand of the issue shall not be construed as expressing an opinion on the merits of defendant's motion. We offer none. The court shall conduct such proceedings and hearings on the motion and decide it anew on the record presented. The court shall make findings of fact and conclusions of law supporting its determination. R. 1:7-4(a).

### III.

Defendant next argues the court violated his due process rights and right to a fair trial by erroneously qualifying Detective Metz as an expert in the area

of "street[-]crime terminology" or "slang" and by permitting the detective to testify at trial about the meaning of putative slang terms in text messages exchanged by and with defendant prior to his arrest.[9] Defendant also contends the court erred by allowing Detective Gregus, who was not qualified as an expert, to testify concerning his interpretation of slang jargon in one of the text messages. Defendant claims he was also denied a fair trial because the prosecutor's closing argument to the jury included comments improperly bolstering Detective Metz's credibility.

The State offered Detective Metz as an expert witness in the field of street-crimes terminology or slang terminology for the purpose of assisting the jury in understanding certain words used in text messages recovered from defendant's cell phone. The court conducted a N.J.R.E. 104 hearing at which Detective Metz testified in part concerning his experience and qualifications as an expert in slang terminology.

---

[9]   At the N.J.R.E. 104 hearing conducted prior to trial, the court qualified Detective Metz as an expert in the area of "street[-]crime terminology." Before the jury at trial, the court qualified Detective Metz as an expert in the area of "slang terminology." We understand that despite the different terms used to identify the detective's area of expertise, there is no substantive difference between them.

Detective Metz testified he has a bachelor's degree in national security studies and an associate's degree in criminal justice. He also detailed his training in narcotics and street-crimes investigations. Detective Metz had been employed as a detective in the MCPO's Narcotics Task Force for about a year prior to the trial and previously had served in the MCPO's Vertical Trial Teams Unit, assisting in trial preparation.

Prior to his employment with the MCPO, Detective Metz had been employed by the Plainfield Police Department for about nine years, with his most recent assignment as a detective in the Narcotics Vice Unit. Prior to becoming a detective, he had worked in the Plainfield Police Department's Street Crimes Unit, targeting high crime and high narcotics areas.

According to Detective Metz, he had been involved in thousands of narcotics investigations over the course of his career, including hundreds in which he had served as the primary investigator. He had also served as an undercover officer and had been required to understand and use street-crimes terminology in that capacity. He also had been involved in the wiretapping of telephone communications and the decoding of messages in the wiretaps.

Detective Metz testified that individuals involved in narcotics distribution often do not speak plainly about their activities and they instead use coded words

34

to describe drugs and guns. He testified he had learned coded words—slang—used to identify drugs and guns through his work in investigating narcotics distribution crimes and by interacting with suspects and other police officers.

He also testified that many of the coded words were used "regardless of the specific city, the specific municipality." He knew this because he had been involved in narcotics investigations that were not confined to Plainfield, where he had been employed as a police officer and detective, and from communicating with law enforcement in various jurisdictions. He also explained that he had learned coded words associated with narcotics and weapons offenses by being around people who used the words, and by arresting people, conducting investigations, and being on the street "almost all day every day" as a police officer and detective. Detective Metz further testified he had used "the coded or street terminology" as it pertained to CDS when he had worked as an undercover officer buying CDS.

Detective Metz also testified about the methodology he utilized to interpret slang words used by individuals involved in criminal activity. He explained he had learned the "coded" words individuals used to disguise their involvement in drugs and weapons offenses by being "around" such individuals and by conducting criminal investigations, arresting individuals charged with

35 A-3326-21

crimes, speaking to "people," including his colleagues in law enforcement, "[j]ust being on the street" as a law enforcement officer in various street-crimes units in which he had worked, using coded slang words while acting as an undercover officer, and by considering the use of the slang words he recognized "in context" and in the "totality of the conversation."

Over defendant's objection, the court qualified Detective Metz as an expert in street-crimes terminology or slang at the conclusion of the N.J.R.E. 104 hearing. At trial, without objection, the detective offered expert opinion testimony concerning the meaning of words used in text messages extracted from the cell phone seized from defendant at the time of his arrest.

Detective Metz testified first concerning the meaning of two text messages attributed to defendant that were sent on August 5, 2019, four days prior to his arrest by Detective Gregus. One text stated, "Fytb one in the head no safety 15 inna clip," and the other, sent eight seconds later, stated, "Correction 16." Detective Metz opined that: "'one in the head' refers to a live round in the chamber" of a gun, "'[n]o safety' refers to a gun without a safety," and "'15 in a clip' refers to [fifteen] rounds of ammunition in a magazine."

He noted that a "magazine" is commonly referred to as a "clip" and that the three separate words or phrases, when considered together, "strongly led

36

[him] to believe that" the message referred to a firearm. He also testified that in his expert opinion, based on the context in which the messages were made, there were no meanings of the words other than those he offered.

The next set of messages Detective Metz interpreted were sent during the evening prior to defendant's arrest. On August 8, 2019, at 10:46 p.m., defendant received from an unidentified individual a message stating "Marcus." A few moments later, defendant responded, "[c]ome get me." The unidentified individual stated, "[i]gh," and defendant responded, stating "I gotta get my" followed by an emoji depicting a hammer.

Detective Metz offered an opinion concerning the final message, stating the hammer emoji "refers to a gun, a hammer." He explained there are many code words for a gun, including "baby girl," "steel," and "hammer." He further opined that there were no words other than gun that the hammer emoji could have referred to in the message.

Detective Metz further testified about a series of four emails exchanged just prior to 12:30 a.m. on August 9, 2019, about nine hours prior to defendant's arrest. In the first of those messages, an unidentified individual states, "[b]ring the radio" and, in response, defendant sent two texts, the first stating, "[r]adio?"

and the second stating, "[b]aby girl?"  The final text message, sent from the unidentified individual, states, "[y]eah."

Detective Metz interpreted the messages, explaining that he immediately understood that "baby girl" referred to a gun because, in his experience, that term "exclusively refers to a gun in this context."  He explained that he initially did not know what "'radio' referred to," but that he had determined it referred to a gun because "[r]adio?" is followed by "[b]aby girl?" in the messages, and the response to the messages was "[y]eah," and that context caused him to "believe" that baby girl and radio are the same thing:  a gun.  Again, Detective Metz testified that in his expert opinion, "[r]adio" and "[b]aby girl" could not refer to anything other than a gun.

The final set of text messages about which Detective Metz opined consisted of two messages at 1:56 a.m. on August 9, 2019.  In the first message to an unidentified individual, defendant states, "[d]on't take my work."  In the second text message, defendant states, "[p]ut it up some where [sic] at least I'm hitting s&l."

Detective Metz opined that in the first text, "work" refers to drugs.  He also opined concerning the meaning of "put it up somewhere at least," stating, "'[p]ut it up' means to stash, to hide drugs or a gun."  He testified that in his

38

expert opinion, there were no other meanings to those words other than the ones he had provided.

Detective Metz's testimony was supplemented in part by Detective Gregus, who separately testified at trial concerning the meaning of "s&l" in the text message, "[p]ut it up some where [sic] at least I'm hitting s&l." Detective Gregus explained that he understood "s&l" to mean "Seaman and Lee," the names of the streets where he had observed defendant engaging in the drug transactions. Defendant objected to Detective Gregus's testimony concerning the meaning of "s&l," arguing in part the detective had not been qualified as an expert to offer that opinion. The court overruled the objection, finding Detective Gregus's testimony had provided "a common sense connection based on the . . . facts in this particular case."

At trial, defense counsel cross-examined Detective Metz concerning his qualifications and his opinions about the meaning of the words used in the text messages found on defendant's phone. The court also charged the jury concerning the consideration of expert testimony in accordance with the model jury charge. Model Jury Charge (Criminal), "Expert Testimony" (rev. Nov. 10, 2003).

Defendant argues the court erred in qualifying Detective Metz as an expert in "slang terminology" because he did not possess specialized knowledge and there was no evidence he had employed a reliable methodology in arriving at his opinions. Defendant claims Detective Metz's years of experience in narcotics and weapons investigations, including his experience as an undercover officer, were insufficient to qualify him as an expert witness and he otherwise lacked any specialized training such that he could be properly qualified as an expert witness in street slang or street-crimes terminology.

The "admission or exclusion of expert testimony is committed to the sound discretion of the trial court." State v. Cotto, 471 N.J. Super. 489, 531 (App. Div. 2022) (quoting Townsend v. Pierre, 221 N.J. 36, 52 (2015)), certif. denied, 252 N.J. 166 (2022). In the absence of "'a clear abuse of discretion[,]'" we "'will not interfere with the exercise of that discretion.'" State v. McGuigan, 478 N.J. Super. 284, 306 (App. Div. 2024) (quoting Nicholas v Hackensack Univ. Med. Ctr., 456 N.J. Super. 110, 117 (App. Div. 2018)).

In pertinent part, N.J.R.E. 702 provides that if "specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To qualify

as an expert witness, an individual must "'be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion.'" McGuigan, 478 N.J. Super. at 306-07 (alteration in original) (quoting Cotto, 471 N.J. Super. at 530).

The proponent of expert testimony bears the burden of establishing its admissibility under N.J.R.E. 702. State v. Torres, 183 N.J. 554, 567 (2005). The Rule imposes three requirements for admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.[10]
>
> [Id. at 567-68 (citations and internal quotation marks omitted).]

"Those requirements are construed liberally in light of [N.J.R.E.] 702's tilt in favor of the admissibility of expert testimony." State v. Jenewicz, 193 N.J. 440, 454 (2008).

---

[10] We consider defendant's challenges to the admissibility of Detective Metz's expert testimony under the standard extant prior to our Supreme Court's decision in State v. Olenowski, 253 N.J. 133, 139 (2023). As the Court explained, the standard for the admission of expert evidence in criminal cases under N.J.R.E. 702 that it established in that case applied "going forward." Ibid.

A-3326-21

Defendant argues the court erred by admitting Detective Metz's testimony because it failed to satisfy the latter two requirements of the N.J.R.E. 702 standard. Defendant claims the State failed to satisfy its burden of establishing street-crimes terminology is a field of expertise such that Detective Metz's testimony could be deemed "sufficiently reliable" and that Detective Metz had "sufficient expertise" to offer opinions on the use of slang or coded words in the messages.

In State v. Derry, the Court considered whether trial testimony offered by a federal law enforcement officer "about his interpretations of slang terms used by [the] defendants and their coconspirators in intercepted telephone communications" constituted admissible lay opinion testimony under N.J.R.E. 701 or inadmissible expert testimony under N.J.R.E. 702 because the witness had not been qualified as an expert. 250 N.J. 611, 616-17 (2022). In its analysis, the Court addressed the admissibility of such testimony under N.J.R.E. 702. Ibid.

The Court cited its decision in Torres as establishing that N.J.R.E. 702's reliability requirement for admission of expert testimony in a particular area may be satisfied by demonstrating that judicial decisions in other jurisdictions have recognized the area of expertise as sufficiently reliable to support expert

42

testimony.  Id. at 632-33 (citing Torres, 183 N.J. at 567-74).  More particularly, the Court noted it had determined in Torres that N.J.R.E. 702's reliability requirement was satisfied for expert testimony concerning the organization and structure of street gangs "[b]ased on the numerous judicial decisions from other jurisdictions that have recognized the appropriateness of admitting certain gang-related expert testimony."  Ibid. (alteration in original) (quoting Torres, 183 N.J. at 574).

In making its determination that a federal agent's testimony concerning the translation of slang or coded words used in the telephone communications captured during an investigation "should have been considered" by the trial court under N.J.R.E. 702, the Court in part noted that "[m]any decisions from the federal courts and other states recognize the importance of testimony in circumstances such as these."  Id. at 634-35 (citations omitted).  For example, in United States v. Gibbs, the court determined "experienced government agents may testify to the meaning of coded drug language under Fed. R. Evid. 702." 190 F.3d 188, 211 (3d. Cir. 1999).  The court further explained that "[b]ecause the primary purpose of coded drug language is to conceal the meaning of the conversation from outsiders through deliberate obscurity, drug traffickers'

jargon is a specialized body of knowledge and thus an appropriate subject for expert testimony." Ibid. (citations omitted).

We reject defendant's argument Detective Metz's expert testimony was inadmissible because he was qualified in a field of expertise that is not sufficiently reliable. As the Court explained in Derry, reliability of such testimony may be established based on "'judicial decisions from other jurisdictions that have recognized the appropriateness of admitting'" such testimony. 250 N.J. at 633 (quoting Torres, 183 N.J. at 574). Here, we need not even look to other jurisdictions because the Court in Derry, relying on precedent in New Jersey and in other jurisdictions, explained that expert testimony concerning the meanings of coded words or slang used by individuals during the commission of drug and weapons offenses is sufficiently reliable to satisfy the second prong of the standard for admission of expert testimony under N.J.R.E. 702.[11] Id. at 633, 635; see also Hyman, 451 N.J. Super. at 446-47 (finding that

---

[11] In finding that interpreting crime-related slang is a sufficiently reliable area of expertise such that qualified experts may provide expert opinion testimony in the area under N.J.R.E. 702, the Court also relied on a "1972 Advisory Committee Notes to Federal Rule of Evidence 702," a rule that our own N.J.R.E. 702 "mirrors." Id. at 633. Quoting from the Advisory Committee Notes, the Court explained that:

interpreting drug slang or code words that are beyond the ken of the average juror falls within a sufficiently reliable area of expertise such that expert testimony about the words is admissible under N.J.R.E. 702). We therefore reject defendant's claim the area of expertise—street-crimes terminology or slang—in which the court had qualified Detective Metz to testify did not satisfy the second prong of the N.J.R.E. 702 standard.

We also reject defendant's argument the State failed to present sufficient evidence establishing Detective Metz had "sufficient expertise" to offer expert testimony about street-crimes terminology or slang under N.J.R.E. 702. See

<hr />

> "when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted."
>
> [Ibid. (quoting 1972 Advisory Committee Notes to F. R. Evid. 702).]

In State v. Hyman, we also cited to the 1972 Advisory Committee Notes to Federal Rule of Evidence 702 as establishing a sufficiently reliable area of expertise within which a properly qualified expert may provide competent opinion testimony under N.J.R.E. 702. 451 N.J. Super. 429, 448 n.4 (App. Div. 2017).

45

Derry, 250 N.J. at 633 (quoting Torres, 183 N.J. at 568). "N.J.R.E. 702 requires a witness to qualify as an expert by 'knowledge, skill, experience, training, or education.'" McGuigan, 478 N.J. Super. at 306 (quoting Olenowski, 253 N.J. at 583 n.26). Indeed, an "expert may be qualified on the basis of . . . experience, even when it is limited." Torres, 183 N.J. at 572. And, "our trial courts take a liberal approach when assessing a person's qualifications." Jenewicz, 193 N.J. at 454.

"[C]ourts allow the thinness and other vulnerabilities in an expert's background to be explored in cross-examination and avoid using such weaknesses as a reason to exclude a party's choice of expert witness to advance a claim or defense." Id. at 455. In determining whether a witness possesses sufficient expertise to offer an expert opinion, "a court should simply be satisfied that the expert has a basis in knowledge, skill, education, training, or experience to be able to form an opinion that can aid the jury on a subject that is beyond its ken." Ibid.

A trial court's determination that a witness is qualified to offer expert testimony "'will be reviewed only for manifest error and injustice.'" Torres, 183 N.J. at 572 (quoting State v. Ravenell, 43 N.J. 171, 182 (1964)). We find no such error here. The record supports the court's detailed findings concerning

Detective Metz's experience, including his duties as an undercover officer and as a detective investigating thousands of narcotics-related crimes. That Detective Metz did not have classroom or other formal training in street-crimes terminology or slang did not require or permit the court to deny the State's request that he should be qualified as an expert. See ibid. (noting that an "expert may be qualified on the basis of his experience, even when it is limited"); see also United States v. Wilson, 484 F.3d 267, 275 (4th Cir. 2007) (explaining that federal "courts of appeal have routinely held that law enforcement officers with extensive drug experience are qualified to give expert testimony on the meaning of drug-related code words"); United States v. Delpit, 94 F.3d. 1134, 1145 (8th Cir. 1996) (finding "silly" an argument that a law enforcement officer was unqualified to testify as an expert about "drug dealers' jargon" because he "lack[ed] degrees or advanced training in the field" and noting the witness qualified as an expert "through nearly [thirty] years of on-the-job experience, the best education there is for this type of thing"). Defendant's claim to the contrary is undermined by the evidence presented at the N.J.R.E. 104 hearing and the court's detailed findings supporting its determination. We find no abuse of discretion in the court's determination Detective Metz was qualified to provide expert testimony.

Our determination the court properly qualified Detective Metz as an expert in street-crimes terminology or slang does not end the inquiry. To provide competent expert testimony, the State was required to demonstrate the detective's opinions were supported by an identification of "the factual bases for [his] conclusions," an explanation of his "methodology," and a demonstration that "both the factual bases and methodology are reliable." Funtown Pier Amusements, Inc. v. Biscayne Ice Cream & Asundries, Inc., 477 N.J. Super. 499, 517 (App. Div. 2024) (quoting Townsend, 221 N.J. at 55) (internal quotation marks omitted). The State satisfied that burden here.

As we explained in Hyman, "once the court permits" expert testimony about street slang or coded words, "it must guard against opinions that stray from interpreting [the] words, and pertain to the meaning of conversations in general and the interpretation of 'ambiguous statements that were patently not drug code.'" 451 N.J. Super. at 447 (quoting State v. Dukagjini, 326 F.3d 45, 55 (2d. Cir. 2003)); see also Dukagjini, 326 F.3d at 55 (noting, for example, an expert may not properly testify about meanings of phrases where "[t]here [is] no evidence that [the] phrases were drug code with fixed meaning either within the narcotics world or within [the] particular conspiracy" for which the defendant had been charged). An issue that must be considered in determining the

admissibility of an expert's opinion on slang or coded words is whether the expert "applied a reliable methodology, based on his training and experience, to interpret the terms . . . used" by the defendant. Id. at 448.

Detective Metz described his methodology during the N.J.R.E. 104 hearing. As noted, based on his experience as a law enforcement officer, he had learned about words and phrases used by individuals involved in criminal activity related to drugs and weapons. For example, he testified that based on his experience, he understood the terms "baby girl" and "hammer" to refer to a gun.[12] During his testimony, he testified about each of the text messages, similarly explaining his understanding of the various words in the messages to support his opinions concerning the meaning of the messages. We discern no error in his testimony describing the meaning of those words in accordance with his plainly stated methodology—attributing the meaning of certain words in the

---

[12] We recognize that Detective Metz also testified he discerned that defendant's use of the term "radio" in that series of text messages also referred to a gun based on the context in which "radio" and then "baby girl" were used. We need not determine whether his reliance on the context to discern the meaning of "radio" is sufficiently reliable to support his opinion because defendant used both terms in the text messages and Detective Metz could properly testify, based on his experience, that "baby girl" meant gun. And, the individual with whom defendant was texting responded "[y]eah" to defendant's question about "[b]aby girl?" and not his initial inquiry concerning "[r]adio?" Thus, any error in permitting Detective Metz to testify that "radio" also meant "gun" is of no consequence.

text messages in accordance with what he had learned during his extensive experience in weapons and drug investigations as well as his interactions with and observations of individuals involved in criminal activity.

Moreover, the text messages were short and direct. Attributing meaning to the words about which Detective Gregus testified did not require any methodology beyond the one he described during the N.J.R.E. 104 hearing, where he explained his opinion testimony was based on his familiarity with the terms in the messages based on his experience. We discern no basis to conclude the detective's methodology was not reliable, and defendant did not believe it to be so at trial—he did not object to the testimony at the N.J.R.E. 104 hearing or at trial based on any claim the methodology Detective Metz's explained and utilized was not reliable. And, as we have explained, we otherwise find no error in the admission of Detective Metz's opinion testimony concerning the messages.

Defendant, however, objected at trial to Detective Gregus's testimony that the meaning of "s&l" in the text message, "[p]ut it up some where [sic] at least I'm hitting s&l." The court decided the testimony was admissible because common sense supported the detective's opinion "s&l" referred to the names of the intersecting streets—Seaman Street and Lee Avenue—where defendant had

been observed by Detective Gregus. However, in finding that common sense supported a finding that "s&l" meant Seaman Street and Lee Avenue, the court simply confirmed the testimony was inadmissible because it was unnecessary to assist the jury in performing its fact-finding function. See State v. McLean, 205 N.J. 438, 456 (2011) (explaining lay opinion testimony may be admitted under N.J.R.E. 701 "only . . . if it falls within the narrow bounds of testimony that is based on the perception of the witness and . . . assist[s] the jury in performing its function"). Stated differently, the testimony was inadmissible because the jury was just as competent as Detective Gregus to discern the meaning of the text message based on the evidence presented. Id. at 459.

Additionally, Detective Gregus was not a party to the exchange of the text message and had no basis grounded in his personal perceptions to offer a lay opinion concerning what defendant had intended in referring to "s&l." See State v. Singh, 245 N.J. 1, 14 (2021) (explaining lay opinion testimony under N.J.R.E. 701 must be "based on the witness's perception, which rests on the acquisition of knowledge through use of one's sense of touch, sight, smell, or hearing" (quoting McLean, 205 N.J. at 457) (internal quotation marks omitted)); see also Hyman, 451 N.J. Super. at 448-49 (finding the trial court erred by allowing a detective involved in an investigation to offer lay opinion testimony concerning

the meaning of "slang" words because the testimony was based in part on information he learned during the investigation and not the witness's personal observations, perceptions, and senses). For those reasons, the court erred by overruling defendant's objection to Detective Gregus's lay opinion testimony.

Because defendant objected to Detective Gregus's testimony about the text message, we review the court's error in admitting the testimony under the harmless-error standard. "To determine whether admission of the evidence constitutes harmless error, the relevant inquiry is whether the purported error 'is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Hedgespeth, 249 N.J. 234, 252 (2021) (quoting State v. Kuchera, 198 N.J. 482, 501 (2009)). Under that standard, there must "be 'some degree of possibility that the error led to an unjust result.'" State v. Ingram, 196 N.J. 23, 49 (2008) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).

We find no basis in the record supporting a possibility the error led to an unjust result. The other evidence presented, including Detective Metz's admissible testimony concerning the meaning of the various text messages, Detective Gregus's testimony concerning his observations, and the arrest of defendant at the intersection of Seaman Street and Lee Avenue, provide substantial support for defendant's convictions independent from Detective

Gregus's lay opinion about the meaning of "s&l" in the text message. Thus, although admitted in error over defendant's objection, we are convinced the error was harmless under Rule 2:10-2.

IV.

Defendant also claims he "was denied due process and a fair trial" because during the State's summation, it made "improper comments . . . opining on the credibility and veracity of" Detective Metz's expert opinions. More particularly, defendant claims the State argued to the jury that Detective Metz had used the slang terms about which he testified "more than any expert who comes in here" and that Detective Metz has "conversations" involving the use of the slang terms "multiple times a day sometimes." Defendant posits that in making such arguments, the State improperly vouched for Detective Metz's credibility and made representations that were not supported by the evidence.

We agree with defendant that the State's arguments were improper. In the first instance, both of the challenged arguments are not supported by evidence presented at trial. There was no evidence that Detective Metz had used the slang terminology "more than any expert who comes in here" or in multiple conversations a day. See State v. Garcia, 245 N.J. 412, 434-35 (2021) (explaining the State may not mispresent to the jury the law or the facts).

Further, in making the argument Detective Metz had used the slang more than any other expert, the State improperly vouched for his expertise and credibility. See State v. Bradshaw, 195 N.J. 493, 509-10 (2008) (noting the State may not without evidence vouch for or bolster a witness's credibility).

Defendant did not object at trial to those statements in the State's summation. Where there is "no objection . . . to the improper remarks, the remarks will not be deemed prejudicial." State v. Frost, 158 N.J. 76, 83 (1999) (citation omitted). Moreover, defendant's failure to object "deprive[d] the court of an opportunity to take curative action." Id. at 84 (citations omitted).

We consider defendant's challenge to the arguments under the plain-error standard, R. 2:10-2, and may reverse only if the error in allowing the arguments was "'clearly capable of producing an unjust result,'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting R. 2:10-2); see also Singh, 245 N.J. at 13; State v. R.K., 220 N.J. 444, 456 (2015). "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Clark, 251 N.J. at 287 (quoting State v. Melvin, 65 N.J. 1, 18-19 (1974)).

Guided by these standards, we find no plain error. The challenged arguments were fleeting when considered in the context of the State's other

detailed and well-supported claims concerning Detective Metz's testimony and the other evidence presented. In addition, the court properly instructed the jury that the statements made by counsel in their summations did not constitute evidence and that it should decide the case based solely on the evidence presented. Thus, although allowed in error, the record does not support a reasoned conclusion that the statements rendered defendant's trial unfair or were clearly capable of leading the jury to a result it would not have otherwise reached based on the evidence presented. Ibid.

V.

We do not consider or decide defendant's argument his convictions for possession of the handgun and large-capacity magazine must be reversed because New Jersey's firearm licensing laws and ammunition device prohibitions are facially unconstitutional under the Second Amendment of the United States Constitution. See generally Bruen, 597 U.S. 1. Defendant did not make the argument before the trial court, and we generally do not consider arguments, including those of constitutional magnitude, raised for the first time on appeal unless they go to the court's jurisdiction or concern matters of significant public interest. State v. Robinson, 200 N.J. 1, 19-20 (2009). We find neither circumstance extant here.

We also do not consider the argument because defendant's failure to assert it deprived the trial court of the opportunity to develop the record necessary for disposition of the claim and thereby rendered the appellate record inadequate to properly address it. See id. at 21 (declining to consider a constitutional issue on appeal in part because the defendant's failure to raise the issue before the trial court "denied [the] reviewing court the benefit of a robust record within which the claim could be considered"). For example, the record does not permit a determination as to whether defendant has standing to challenge the constitutionality of the handgun-licensing statute, N.J.S.A. 2C:58-4, see generally State v. Wade, 476 N.J. Super. 490, 503-08 (App. Div. 2023), or whether any of the challenged requirements of New Jersey's licensing statutes are inconsistent with this "Nation's historical tradition" such that they permit a determination defendant's "conduct falls outside the" protections of the Second Amendment under the Bruen standard. Wade, 476 N.J. Super. at 502.

Similarly, defendant's failure to raise his Second Amendment claim deprived the State of the opportunity to establish a record supporting the constitutionality of the handgun licensing statute, N.J.S.A. 2C:58-4, and the statutes imposing a partial ban on large-capacity magazines, N.J.S.A. 2C:39-3(j) and N.J.S.A. 2C:39-1(y). Indeed, defendant argues on appeal that N.J.S.A.

2C:39-3(j)'s partial ban on the possession of a large-capacity magazine is presumptively unconstitutional under <u>Bruen</u> but acknowledges the State may rebut the presumption by demonstrating the ban is "consistent with the Nation's historical tradition of firearm regulation." <u>Wade</u>, 476 N.J. Super. at 502. The argument, however, ignores that defendant's decision not to raise his Second Amendment challenge before the trial court deprived the State of the opportunity to make the demonstration required to rebut whatever presumption to which defendant may have been entitled under <u>Bruen</u>.[13]

For those reasons, we do not consider defendant's Second Amendment challenges to his convictions for unlawful possession of a handgun and large-capacity magazine. For the same reasons, we do not address the State's arguments addressing the merits of defendant's claim or the arguments of amicus curiae, the Attorney General of New Jersey.

---

[13] Our discussion of defendant's Second Amendment challenge to his convictions is not intended to address the merits of the claims asserted or express a view on the merits. We have noted certain issues simply to illustrate that defendant's decision not to raise his Second Amendment claims before the trial court in the first instance renders the record inadequate to permit a proper review of the arguments presented for the first time on appeal and otherwise deprived the State of the opportunity to develop the record to support its opposition. <u>See</u> <u>Robinson</u>, 200 N.J. at 21.

## VI.

Defendant argues he is entitled to resentencing because the judgment of conviction includes errors, the court improperly considered a dismissed charge in its finding and weighing of the statutory sentencing factors, the court erred in awarding jail credits, and his sentence is excessive. We consider the claims in turn.

We agree with defendant, and the State concedes, that the judgment of conviction includes two errors. It erroneously states that the court imposed an eighteen-month sentence on count seven, which charged defendant with fourth-degree possession of a prohibited device, a large-capacity magazine, N.J.S.A. 2C:39-3(j). The court actually imposed a fifteen-month sentence on that count. Additionally, the judgment of conviction erroneously states that defendant's convictions were the product of a plea agreement when, in fact, defendant was convicted following a jury trial. We therefore remand in part for the court to amend the judgment of conviction to correct those errors.

We next consider defendant's claim the court erred by failing to award an additional day of jail credit. The issue of jail credits was discussed at sentencing, and the court awarded the following: jail credit from August 9, 2019 to September 4, 2019, and gap time credit from December 23, 2020 to May 18,

2022.[14]  The court did not award any credit for the period between November 11, 2019, and December 22, 2020, "because according to the Pre-Sentence Report those were days . . . defendant was serving a juvenile parole violation." The court asked that counsel "nail down the details of that, so . . . any modification to the sentence . . . can be made."

The judgment of conviction lists defendant's time spent in custody as between:  August 9 to September 4, 2019; November 11 to 25, 2019; and April 30 to December 21, 2020, see R. 3:21-8.  It also reflects gap time credit from December 22, 2020, to May 18, 2022, N.J.S.A. 2C:44-5(b)(2).

Defendant acknowledges he is not entitled to jail credit for time he spent in custody prior to sentencing and while he was serving a violation of his juvenile parole.  State v. Black, 153 N.J. 438, 461 (1998).  He contends the judgment of conviction incorrectly states he began serving his parole violation on November 26, 2019, and he contends he actually began serving the violation a day later, on November 27, 2019, such that he should receive an additional day of jail credit for November 26, 2019.

---

[14]  Although the trial record identifies the period between December 23, 2020, and May 18, 2020, we discern the court misspoke and meant May 18, 2022, as reflected in the judgment of conviction.

The State argues "[d]efendant is not entitled to one more day of credit" for November 26, 2019. The State contends "a warrant was issued and enforced against defendant for a violation of juvenile probation on November 26, 2019," and therefore "his credit on the unrelated criminal charge stopped on November 25, 2019."

The record on appeal does not permit a resolution of the conflict between the parties' factual assertions. On remand, the court shall address and resolve the factual dispute and make appropriate findings supporting its determination as to defendant's claimed entitlement to the additional day of jail credit. If necessary, the court shall amend the judgment of conviction to reflect any change in the jail credits awarded.

We are not persuaded by defendant's claim the court erred by considering a previously-dismissed charge and in its weighing of the aggravating and mitigating factors. In summarizing defendant's history, the court mentioned a dismissed charge, but the record does not establish the court relied on the dismissed charge in its assessment of the aggravating and mitigating factors under N.J.S.A. 2C:44-1(a) and (b).

We also reject defendant's claim the aggregate seven-year sentence imposed by the court is excessive. We review the court's sentencing decision

A-3326-21

for an abuse of discretion, State v. R.Y., 242 N.J. 48, 73 (2020); State v. Miller, 237 N.J. 15, 28 (2019), and do not "substitute [our] judgment for th[at] of our sentencing courts," State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)).  Where a court imposes sentence within the statutory guidelines, and its findings as to the aggravating and mitigating factors are supported by competent, credible evidence in the record, and properly balanced, we shall affirm the sentence unless it is so unreasonable that it shocks the judicial conscience.  N.J.S.A. 2C:44-7; State v. Rivera, 249 N.J. 285, 297-98 (2021); State v. Liepe, 239 N.J. 359, 371 (2019); Case, 220 N.J. at 65; State v. Roth, 95 N.J. 334, 363-66 (1984).

The court's finding and weighing of the statutory sentencing factors is supported by the record and the aggregate sentence imposed is within the range of sentences for a conviction of a second-degree offense.  We affirm the sentence and reject defendant's claimed entitlement to resentencing.

## VII.

In sum, we affirm defendant's conviction and remand in part for the entry of an amended judgment of conviction to correct the errors we have identified and for a determination of defendant's claimed entitlement to an additional day of jail credit.  We vacate the order denying defendant's motion to suppress the

evidence seized from the plastic bags and remand for a different judge to conduct a hearing for the purpose of determining whether the evidence in the bags was in plain view such that the search of the bags and seizure of evidence without a warrant was lawful.

As we have noted, if, following the hearing, the remand court determines the discovery and seizure of some or all of the contraband in the bags is not supported under the plain-view exception to the warrant requirement, the court shall suppress the evidence unlawfully seized, set aside defendant's convictions, and conduct a retrial if required. If the court determines the discovery and seizure of the contraband was proper under the plain-view exception to the warrant requirement, it shall enter an order to that effect from which defendant may file a timely appeal.

To the extent we have not expressly addressed any of defendant's remaining arguments, including his claim cumulative errors warrant the reversal of his conviction, we find they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3326-21